668 F.2d 1238
 215 U.S.App.D.C. 206
 UNITED STATES of America,
v.
Henning HELDT and Duke Snider, Appellants.
UNITED STATES of America,
v.
Mary Sue HUBBARD, Appellant.
UNITED STATES of America,
v.
Sharon THOMAS, Appellant.
UNITED STATES of America,
v.
Gregory WILLARDSON, Appellant.
UNITED STATES of America,
v.
Richard WEIGAND, Appellant.
UNITED STATES of America,
v.
Cindy RAYMOND, Appellant.
UNITED STATES of America,
v.
Gerald Bennett WOLFE, Appellant.
UNITED STATES of America,
v.
Mitchell HERMANN, Appellant.
 Nos. 79-2442, 79-2447 to 79-2450, 79-2456, 79-2459 and 79-2462.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 27, 1981.
Decided Oct. 2, 1981.
As Amended Oct. 2 and 30, 1981.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil No. 78-401).
 Philip Hirschkop, with whom Leonard S. Rubenstein and Geraldine R. Gennet, Alexandria, Va., were on the brief, for appellants in No. 79-2442. Counsel presented argument on behalf of all appellants on the issues of search and seizure.
 Earl C. Dudley, Jr., Washington, D.C., for appellants in Nos. 79-2456 and 79-2462. Michael Nussbaum and Ronald Precup, Washington, D.C., also entered an appearance for appellants in Nos. 79-2456 and 79-2462.
 Leonard Boudin, New York City, with whom Eric Liberman, San Francisco, Cal., and Dorian Bowman, New York City, were on the brief for appellant in No. 79-2447.
 John Zwerling with whom Jonathan Shapiro and Diana Lee Evans, Alexandria, Va., were on the brief for appellant in No. 79-2459.
 Leonard J. Koenick, Washington, D.C., was on the brief for appellant in No. 79-2448.
 Roger E. Zuckerman and Roger C. Spaeder, Washington, D.C., were on the brief for appellants in No. 79-2449 and 79-2450.
 Steven C. Tabackman and Melvyn H. Rappaport, Asst. U.S. Attys., with whom Charles F. C. Ruff, U.S. Atty., John A. Terry, Michael W. Farrell, Raymond Banoun, Judith Hetherton and Timothy J. Reardon, III, Asst. U.S. Attys. Washington, D.C., were on the brief for appellee.
 Nadine Strassen was on the brief for amicus curiae, American Civil Liberties Union, urging reversal with respect to the search and seizure issue in Nos. 79-2442, 79-2447, 79-2448, 79-2449, 79-2450, 79-2452, 79-2456 and 79-2462.
 Frederic R. Kellogg, Boston, Mass., was on the statement in lieu of brief for amicus curiae, National Moratorium on Prison Const., et al., in Nos. 79-2447, 79-2448, 79-2449, 79-2450, 79-2452 and 79-2462.
 Before MacKINNON, ROBB and WALD, Circuit Judges.
 Opinion PER CURIAM.
 
 
 1
 Opinion concurring in part and concurring in the result filed by Circuit Judge WALD.
 
 PER CURIAM:
 
 2
 Appellants,[1] members of the Church of Scientology ("Scientology"), were indicted for completed conspiracies and substantive offenses involving their plan to identify, locate and obtain by various illegal means certain documents in the possession of the United States which related to Scientology, and their efforts thereafter to obstruct justice by thwarting the government's investigation of such criminal activities, by harboring and concealing a fugitive from arrest, and by causing the making of false declarations under oath before a grand jury.[2]
 
 
 3
 Appellants' motion before the district court to suppress documentary evidence seized in searches of Scientology offices in California[3] was denied after an extensive hearing. Thereafter, on October 8, 1979, Judge Richey, over the government's objection, granted appellants' motion to require the government to comply with a Disposition Agreement to which appellants contended the government had agreed.[4] Under this Agreement, each appellant was to be found guilty by the court on one specified count on the basis of the "Stipulation of Evidence." Upon consideration of this uncontested evidence and in accordance with the Disposition Agreement, the court found appellants guilty as follows: Hubbard, Heldt, Snider, Willardson, Weigand and Wolfe, of conspiracy to obstruct justice and other offenses (Count 23); Hermann, of conspiracy to burglarize government offices and steal documents (Count 1); and Thomas, of misdemeanor theft of government property (Count 17).
 
 
 4
 On December 4, 1979, after the presentence reports were received, appellants moved for Judge Richey's recusal. Judge Richey declined to continue the sentencing of appellants pending his ruling on the motion, and appellants were sentenced on December 6 and 7.[5] The recusal motion was subsequently denied in a memorandum and order filed on December 14, 1979 (J.A. at 387-93). These appeals followed.[6]
 
 
 5
 The district court had previously ruled that
 
 
 6
 defendants have agreed not to challenge the sufficiency of the evidence before the trial court or on appeal. That is, the defendants will not challenge the accuracy of the facts stipulated by the government, and the defendants will not assert that the facts alleged do not amount to a violation of the crime charged because of other considerations.
 
 
 7
 Memorandum Opinion filed October 8, 1979, at 11 (J.A. at 358). This permitted appellants to raise the constitutionality of the search on appeal, which they have done.
 
 
 8
 The facts giving rise to this case involve appellants' covert operations to steal government documents pertaining to Scientology and a conspiracy to obstruct justice in connection with those operations. This program was carried out by the defendants and others through what were termed the "Guardian Offices" of Scientology. To conceal evidence of their activities, defendants initiated the "Red Box" program by a general order dated 25 March 1977.[7] As indicated by the "Red Box" memorandum (n.7), that program was primarily designed to secrete and destroy documentary proof that Mary Sue Hubbard and her husband L. Ron Hubbard[8] engaged in any "illegal" or "incriminating activities." The existence of the Red Box program also illustrates the difficulty the government faced in obtaining documentary and other proof of the knowledge and intent of the defendants in carrying out their various criminal programs against various agencies of the government.
 
 
 9
 The principal contentions raised by appellants are: (1) that the government breached its plea agreement with Wolfe when it prosecuted him for conspiracy; (2) that the search of the offices of Scientology in California violated the fourth amendment; (3) that the trial judge should have recused himself on appellants' motion; (4) that the trial court erred in denying appellants' motion to disqualify all attorneys in the office of the United States Attorney from prosecuting the case; (5) that the government violated its agreement not to allocute at Hubbard's sentencings; and (6) that Hubbard's first and sixth amendment rights were violated by the refusal of the government and the court to grant "use" immunity to co-defendant Kember so that she could offer allegedly "exculpatory" testimony on Hubbard's behalf.
 
 
 10
 For the reasons set forth in detail in Parts I-VI infra, we reject each of these contentions and affirm the district court judgment. Because resolution of the issue involving Wolfe requires recitation of many of the facts that underlie this case, we address it first. Other facts will be set out as they become relevant to the other issues, which will be addressed in Parts II-VI.
 
 
 11
 I. WOLFE'S CLAIM THAT HIS PROSECUTION WAS BARRED
 
 
 12
 The appellant Wolfe contends that his prosecution for conspiracy, 18 U.S.C. § 371 (1976) is barred by his agreement to plead and his plea of guilty to misuse of a government seal, 18 U.S.C. § 1017 (1976). We disagree.
 
 
 13
 Resolution of the issue raised by Wolfe requires a statement of the facts and circumstances leading up to and surrounding his agreement to plead guilty, together with a summary of the events that followed. The narrative begins on the night of May 21, 1976 when the night librarian for the District of Columbia Bar Association library in the United States Courthouse saw two men come to the library and thereafter use the photocopy machine in the United States Attorney's Office. The same two men returned on the night of May 28. The librarian's suspicions being aroused, he alerted the United States Attorney's office which in turn informed the Federal Bureau of Investigation. A check of the sign-in logs of the courthouse and the library by FBI agents revealed that on May 21 the men had used the names of "J. Wolfe" and "J. Foster", and on May 28 the names of "Hoake" and "J. Foster". The FBI agents told the librarian to call the FBI if the men appeared again.
 
 
 14
 On June 11, 1976 the men did return to the library and the FBI was called. Two FBI agents confronted the men in the library and asked them for identification. Each produced what appeared to be an official Internal Revenue Service identification card bearing his photograph. One man showed the agents a card in the name of Thomas Blake and the other man exhibited a card in the name of John M. Foster. On checking with the IRS the agents determined that there was an IRS employee named Thomas Blake. Accordingly "Blake's" card was returned to him after the number on the card was noted. When "Foster" said he was no longer an IRS employee his identification card was confiscated. Both men were then permitted to leave the courthouse.
 
 
 15
 Three days later the FBI discovered that the man who had produced the Blake identification card was not the Thomas Blake employed at IRS. Moreover, the number which had appeared on the Blake card was assigned to another IRS employee.
 
 
 16
 On June 30, 1976 one of the FBI agents encountered "Blake" by chance in the hallway of the IRS National Office Building. The agent again asked him for identification. When he produced an IRS identification card in his true name, Gerald Bennett Wolfe, he was placed under arrest. The "Thomas Blake" identification card was not recovered. By complaint filed the same day Wolfe was charged with having used and possessed on June 11, 1976 a falsely made, forged and altered official pass and permit in violation of 18 U.S.C. § 499 (1976). He waived the forty-five day limit for the filing of an indictment or information.
 
 
 17
 Continuing investigation by the FBI disclosed the following information:
 
 
 18
 1. The "Foster" identification card had probably been made on the equipment located in the identification room of the IRS which was supposedly subject to tight security;
 
 
 19
 2. For several weeks before the end of June 1976 "Foster" had used the card approximately three times a week to enter the IRS building;
 
 
 20
 3. According to the sign-in log "Thomas Blake" had entered the IRS building on a Saturday in late April or early May 1976. No description of this man was obtained;4. The man who used the "Foster" card was Michael J. Meisner. Meisner had never been an employee of the IRS but since 1973 had been a member and employee of Scientology in Washington, D.C. He disappeared from Washington shortly after the courthouse encounter. A warrant for his arrest was issued August 5, 1976, but he was not apprehended. As we shall see, he remained a fugitive until June 19, 1977, when he voluntarily surrendered.
 
 
 21
 In addition to the information developed by the FBI the United States Attorney's Office at this time became aware of documents which had been produced by Scientology in connection with two civil actions in California. These documents suggested a Scientology plan to obtain information regarding pending lawsuits by infiltrating various IRS offices as well as the United States Attorney's Office in Los Angeles. Several such lawsuits filed by Scientology were pending in the District of Columbia and were being defended by the United States Attorney's Office. Counsel for Scientology in the California actions characterized the infiltration plan as a "misguided fantasy of someone".
 
 
 22
 On July 16, 1976 Wolfe and his attorney met with an assistant United States Attorney in the District of Columbia and Wolfe attempted to explain his nocturnal visits to the Bar Association library. He said that in a Georgetown bar he had chanced to meet a stranger who said his name was John Foster and that when Foster professed to be a law student, Wolfe asked him to teach Wolfe how to do legal research. Wolfe and Foster had gone to the Bar Association library for this purpose, and used the United States Attorney's xerox equipment only to copy material found in law books. As for the false identification cards Wolfe said he and Foster had got drunk one night and as part of a "drunken lark" had wandered into the IRS identification room and made false identification cards for themselves. He knew nothing more about Foster, did not know where he lived or where he was, his only association with Foster having been meetings in bars and the legal research project. As might have been expected the Assistant United States Attorney did not believe this story and he told Wolfe so.
 
 
 23
 After the meeting in the United States Attorney's Office there were plea negotiations between that office and Wolfe and his attorney. The government offered to permit Wolfe to plead guilty to a misdemeanor if he in turn would cooperate with the United States Attorney and the grand jury by giving truthful testimony about what he and Foster were doing in the courthouse and the United States Attorney's Office, and by revealing the identity of the person or persons who had told him to make the entry. The United States Attorney was of course interested in apprehending the second man who had been with Wolfe. Until approximately April 1977 it appeared that Wolfe intended to accept the offer of a misdemeanor plea. However, at that time Wolfe suddenly informed the government, through his attorney, that he would not accept the plea offer and that he was retaining new counsel. He did retain new counsel and agreed to enter a plea of guilty to misuse of a government seal, 18 U.S.C. § 1017 (1976), a felony.
 
 
 24
 Wolfe entered his plea of guilty before District Judge Flannery on May 13, 1977. The terms of the plea agreement were disclosed on the record by the Assistant United States Attorney, Mr. Stark, and confirmed by Wolfe's newly retained attorney as follows:
 
 
 25
 MR. STARK: Your Honor, this case is before Your Honor for a disposition pursuant to the information filed yesterday afternoon with the court charging a felony one count of fraudulent use of a government seal. The defendant in this case, Gerald Bennett Wolf (sic), has agreed to enter a plea of guilty to this charge; in exchange therefor, the government has agreed not to charge Mr. Wolf (sic) with any other possible violations arising out of three separate entries into this courthouse with another man in May and June of last year using a false and fraudulently obtained Internal Revenue I.D. card.
 
 
 26
 In addition, the government will not oppose Mr. Wolf's (sic) remaining on personal recognizance pending sentence, and the government expressly reserves its right to allocute at the time of sentence. I believe Mr. Schmidt, that is an accurate statement of the plea agreement.
 
 
 27
 MR. SCHMIDT: I agree that that is an accurate statement of our agreement....
 
 
 28
 (J.A. 73, 74) Following these statements the court addressed Wolfe as follows:
 
 
 29
 THE COURT: Now, it has been indicated that in return for your plea to this Information, the government will not charge you with any other possible offenses arising out of the three incidents occurring in May or June of 1976 growing out of the use of this fraudulent identification. The government will not oppose your remaining on bond pending the sentence. The government, however, reserves the right to speak against you or to allocute at the time of your sentence.
 
 
 30
 Now, are those the only promises that have been made to you in this case?
 
 
 31
 THE DEFENDANT: Yes, sir.
 
 
 32
 THE COURT: Has anyone threatened you to cause you to plead guilty in this case?
 
 
 33
 THE DEFENDANT: No, sir.
 
 
 34
 (J.A. 83)
 
 
 35
 Wolfe was sentenced on June 10, 1977. At the sentencing the Assistant United States Attorney summarized what was known to the government about Wolfe's activities and said that in the opinion of the government Wolfe had not told the truth to the United States Attorney and the probation office. He added:
 
 
 36
 (T)he Government is concerned about this case primarily because of what it does not know, rather than what it does know.
 
 
 37
 We are puzzled why this young man who has never been in conflict with the law before has chosen to plead to a five-year five thousand dollar felony and expose himself in that respect to the adverse collateral consequences that flow from a felony conviction rather than plead to a misdemeanor which we did offer him ....
 
 
 38
 (J.A. 92) On behalf of Wolfe his attorney told the court:
 
 
 39
 What we have here is a situation in which he and another individual, very poorly advised, went into Mr. Wolfe's place of employment sufficiently filled by alcohol, and decided to play around with the identification machines.
 
 
 40
 The Government has no knowledge that any classified information was revealed during these times that he was in using the Xerox machine, as he so states, or that he had gone anywhere beyond the Xerox machines. They have no evidence that their files had been rifled in any manner.
 
 
 41
 (J.A. 89, 100) He asked the court to sentence Wolfe solely on the basis of "what information is provable and here before this court." (J.A. 100)
 
 
 42
 The court placed Wolfe on probation for two years with the condition that he contribute 100 hours of community service work, without compensation, during the period of his probation.
 
 
 43
 Immediately after he was sentenced Wolfe was subpoenaed to appear before the grand jury on the same day. Before the grand jury Wolfe was questioned at length about his entries into the courthouse and the story he had given to explain what he was doing. He repeated the Foster-legal research explanation. We shall discuss this grand jury appearance later in this opinion.
 
 
 44
 On June 20, 1977, ten days after Wolfe was sentenced, Michael Meisner, who was in California, called Assistant United States Attorney Stark by telephone, saying he wished voluntarily to return to the District of Columbia and cooperate with the government. He arrived in Washington that evening. In a series of interviews over the next two weeks he recounted in detail the criminal actions he and other members of Scientology had committed. His statement described a criminal conspiracy by Scientologists to obstruct justice, suborn perjury, steal government property, and harbor a fugitive. What follows is a brief summary of Meisner's statement.
 
 
 45
 Meisner had been an active member of Scientology since 1970. Beginning in January 1974 he was the Assistant Guardian for Information in the District of Columbia. The Guardian's Office is charged with the protection of Scientology. The Guardians handle intelligence matters including covert operations to acquire government documents critical of Scientology, internal security within Scientology, and covert operations to discredit and remove from positions of power all persons whom Scientology considers to be its enemies. Mary Sue Hubbard and Henning Heldt are the ranking officers of the Guardians in the United States, with offices in Hollywood, California.
 
 
 46
 In early 1974 Guardian Order 1361 (GO 1361) was issued by Guardian World-Wide Jane Kember whose office was in England. This order called for an all-out attack on the Internal Revenue Service which was to include the filing of law suits, a public relations assault, and infiltration of IRS by agents of Scientology. Pursuant to that order, in the summer of 1974, it was decided to plant an agent of Scientology within the National Office of the IRS in Washington, D.C. Cindy Raymond, a member of the staff of the Deputy Guardian for Information, together with Meisner and Mitchell Herman, who was then responsible for covert operations activities, were assigned the task of recruiting such an individual. Gerald Bennett Wolfe was recruited. Wolfe came to Washington and by November 1974 had obtained a position as clerk-typist at the IRS. To demonstrate to Wolfe that IRS files could be obtained Meisner and Herman entered the IRS building, went to an office in the Exempt Organization Branch and took a file relating to Scientology out of a filing cabinet. The file was taken out of the IRS building, xeroxed and returned the next morning.
 
 
 47
 On November 1, 1974 Mitchell Herman and a Scientology technician from Los Angeles surreptitiously entered the IRS building and placed a listening device in a conference room which they knew was about to be used for a high-level IRS meeting on Scientology. They tape-recorded the meeting and later Meisner saw a transcript of the tape.
 
 
 48
 From December 1974 to March 1975 Herman directed several burglaries of the office of an attorney in the Refund Litigation Division of the Chief Counsel of IRS. In March 1975 Meisner took over from Herman the supervision of all covert Scientology agents within government offices. He supervised Wolfe's activities at IRS and on numerous occasions accompanied Wolfe into the IRS building after working hours for the purpose of breaking into offices and copying documents relating to Scientology. The documents would be xeroxed and the copies sent to the Los Angeles Guardian's Office. In his statement Meisner specified a number of such burglaries.
 
 
 49
 In July 1975, acting on instructions from Meisner, Wolfe entered the Tax Division of the Department of Justice in the Star Building in the District of Columbia. Wolfe entered the Tax Division's Offices some four times and removed documents which were copied and sent to Los Angeles.
 
 
 50
 In December 1975 a program was developed to obtain INTERPOL documents concerning Scientology, contained in files held by government agencies. To this end Meisner recruited Sharon Thomas, a Scientologist, and directed her to apply for a secretarial position within the Justice Department. She did so, and obtained a position as the personal secretary of the Department of Justice attorney who was handling the Scientology Freedom of Information suit against INTERPOL. Thomas took documents from the attorney's files as well as INTERPOL files and delivered them to Meisner. It developed however that most of the sought-after INTERPOL documents were not at the Department of Justice but probably were in the Office of Assistant United States Attorney Dodell in the United States Courthouse. Accordingly Meisner and Wolfe directed their attention to Dodell's office.
 
 
 51
 Some time in March 1975 Meisner and Wolfe entered the IRS building after hours, using Wolfe's IRS credentials. Once inside they broke into the room in which the equipment used to make identification cards was located and made themselves false identification cards using fictitious names. These credentials were later used to enter the United States Courthouse.
 
 
 52
 During the first week of May 1976 Meisner and Wolfe entered the courthouse during working hours and went to the Bar Association library on the third floor. They waited until work hours ended and then began to wander around to locate Dodell's office. They found the office in a small hallway leading from the back of the library. They attempted to open Dodell's door with a tool they had used in the past but were unsuccessful. Two or three days later Wolfe returned to the courthouse during his lunch hour and went to the Dodell office. Both Dodell and his secretary were out but Wolfe noticed a set of keys on the secretary's desk. He took the keys, called Meisner, and they went to a locksmith and had four of the keys duplicated. They then returned to the courthouse and dropped the secretary's keys in the corridor outside Dodell's office, so the secretary would assume they had fallen out of her purse.
 
 
 53
 On the night of May 21, 1976 Meisner and Wolfe returned to the Bar Association library, signing in as J. Wolfe and J. M. Foster. Proceeding to Dodell's office through the back of the library they used one of their duplicate keys to open the door. They reviewed three drawers full of files maintained in the course of FOIA litigation instituted by Scientology. They located the INTERPOL file as well as a general file on Scientology violations and some Scientology files containing documents obtained from the District of Columbia Police Department. Placing some ten or twelve files in their briefcases they took them to the photocopy machines in the United States Attorney's Office where for two hours they xeroxed the documents. These activities produced a 5-inch stack of papers. The men then returned the files to Dodell's office and left the courthouse. After reviewing the documents Meisner sent them along to the Scientology office in California.
 
 
 54
 On the night of May 28, 1976 Meisner and Wolfe returned to the courthouse, signing themselves in as Hoake and J. M. Foster. They went to Dodell's office, filled their briefcases with Scientology files and xeroxed them on the United States Attorney's machines. Working together on two machines they produced a stack of documents slightly larger than the one of May 21.
 
 
 55
 After reviewing the documents obtained on May 28 Meisner determined that one more visit to Dodell's office would be necessary to copy the remaining Scientology documents. He was also instructed by Mitchell Herman that he was to obtain any personal information about Dodell which he could find, the purpose being to remove Dodell from a government position because he was a threat to Scientology. To carry out this operation Meisner and Wolfe returned to the courthouse on the night of June 11, 1976. They signed in as Thomas Blake and John M. Foster, using the false credentials they had made during their IRS break in. While they were waiting in the library, before proceeding to Dodell's office, they were confronted by two FBI agents who questioned them and confiscated the Blake credentials.
 
 
 56
 Frightened by the appearance of the FBI Meisner and Wolfe on leaving the courthouse took a circuitous route on foot in order to evade any pursuer, and then took a taxi to a tavern in Georgetown. There Meisner telephoned to Mitchell Herman at the Guardian's Office in Los Angeles and informed him in cryptic language that a major development had occurred. Herman told him to call back to a telephone located outside the Scientology offices. Meisner did so and then told Herman what had occurred. Later that night Herman instructed him to come to Los Angeles the next morning. Without going home Meisner then checked into a motel where he spent the night before leaving for Los Angeles on an 8:30 A.M. flight.
 
 
 57
 On his arrival in Los Angeles Meisner gave his superiors a full written report of the courthouse incident and met with them to determine how to deal with the situation. Two proposals were considered. One was to send Wolfe to the District of Columbia with a prepared cover-up story as to why he was in the courthouse, in order to see what the authorities would do. Meisner would be sent to Washington after Wolfe's case was finished, and would also be instructed on what to say. Neither would admit any association with Scientology. The second plan was to send both Meisner and Wolfe to Washington at the same time and let them take whatever punishment was meted out, again always denying any association with Scientology. It was decided to summon Wolfe to Los Angeles immediately and Meisner was told to stay at a motel in Hollywood.
 
 
 58
 The next day, June 13, after further discussion, it was decided to send Wolfe back to Washington with a cover-up story, and later to send Meisner. Once the proceedings against Wolfe were completed Meisner would be sent to the District of Columbia with a parallel cover-up story. It was decided that Meisner would change his physical appearance and go into hiding.
 
 
 59
 On Monday, June 14, Meisner shaved his mustache and a Scientology employee visited him at the motel and cut and dyed his hair. He was also given money to buy contact lenses to replace his eyeglasses. He purchased the lenses.
 
 
 60
 On the afternoon of June 14 Wolfe, accompanied by two Scientology officers, arrived at Meisner's motel room and the cover stories were developed. Wolfe was drilled on the specifics of the story to make sure he could stick by it. The story was the one he afterwards told the United States Attorney and the grand jury about his meeting with Foster and his legal research project. Meisner was to tell a story that corroborated Wolfe's.
 
 
 61
 In furtherance of the scheme agreed upon in Los Angeles Wolfe was returned to the District of Columbia where he was arrested June 30, 1976. Meisner remained in California. On June 14, 1976 Meisner was named National Secretary of Scientology, with an office in the Guardian's Office in Los Angeles. When it was learned that a warrant had been issued for his arrest in the District of Columbia he was removed from any official position with Scientology, but he continued to function in an unofficial capacity. He remained in hiding. This situation continued until some time in April 1977 when Meisner indicated he was tired of waiting for the case to be resolved and wished to be sent back to the District of Columbia as soon as possible. When he threatened to take the situation in his own hands he was placed under 24-hour guard, and on one occasion was removed from one building to another, handcuffed and gagged. On another occasion he was apprehended by Scientologists in Las Vegas and returned in their custody to Los Angeles where he was again placed under house arrest. Finally, on June 20, 1977 he telephoned to the United States Attorney's Office in the District of Columbia that he wished to surrender.
 
 
 62
 On July 8, 1977 the offices of Scientology in California were searched by FBI agents, pursuant to a warrant issued on the basis of Meisner's statements to the government. Numerous documents were seized. This search and seizure are discussed elsewhere in this opinion. The seized documents confirmed the statements to the government previously made by Meisner.
 
 
 63
 On August 15, 1978 Wolfe and the other defendants were indicted by a grand jury in the United States District Court for the District of Columbia. The indictment was in twenty-eight counts. Wolfe stipulated that the District Court might find him guilty on Count Twenty-three upon the basis of a "Stipulation of Evidence", and the court did find him guilty on that count. The Stipulation also confirmed Meisner's statements. So far as Wolfe is concerned, therefore, we are concerned only with Count Twenty-three.
 
 
 64
 Count Twenty-three alleges a conspiracy to obstruct justice in violation of 18 U.S.C. § 1503 (1976), to obstruct a criminal investigation in violation of 18 U.S.C. § 1510 (1976), to harbor and conceal a fugitive in violation of 18 U.S.C. § 1071 (1976); and to make false declarations in violation of Title 18 U.S.C. § 1623 (1976). The conspiracy is alleged to have begun on or about June 11, 1976 the day Wolfe and Meisner were confronted by FBI agents in the Bar Association library. As preliminary and explanatory matter Count Twenty-three alleges (paragraph 1) that between May 21 and June 11, 1976 Wolfe and Meisner on three occasions, using forged IRS credentials, entered the courthouse for the purpose of burglarizing and stealing documents from the office of an Assistant United States Attorney; and that on June 11, during the third of these entries, they were confronted and questioned by FBI agents (paragraph 2). It is further alleged that beginning on June 11 the United States Attorney, the FBI and the grand jury were investigating the entries into the office of the United States Attorney by Wolfe and Meisner (paragraph 3), that on June 30, 1976 Wolfe was arrested and on August 5, 1976 a warrant was issued for Meisner's arrest (paragraphs 4, 5). Continuing, the count alleges that on May 13, 1977 in Criminal Case 77-283, Wolfe pled guilty to the wrongful use of a government seal in violation of 18 U.S.C. § 1017 (1976), and that on June 10, 1977 he was sentenced and that same day testified before the grand jury (paragraphs 6, 7).
 
 
 65
 The object and means of the conspiracy are alleged as follows:
 
 
 66
 9. It was an object of said conspiracy to corruptly influence, obstruct and impede, and corruptly endeavor to influence, obstruct and impede, the due administration of justice in connection with the investigation referred to in paragraph three (3) above, and in connection with the case of United States v. Gerald Bennett Wolfe, Criminal Case No. 77-283, referred to in paragraphs six and seven (6 and 7) above, for the purpose of concealing and causing to be concealed the identities of the persons who were responsible for, participated in, and had knowledge of (a) the activities which were the subject of the above-mentioned investigation and judicial proceedings, and (b) other illegal and improper activities.
 
 
 67
 10. It was further an object of said conspiracy, for the purposes stated in paragraph nine (9) above, willfully to endeavor by means of misrepresentation, intimidation, and force and threats thereof to obstruct, delay, and prevent the communication of information relating to a violation of a criminal statute of the United States by a person to a criminal investigator.
 
 
 68
 11. It was further an object of said conspiracy, for the purposes stated in paragraph nine (9) above, that the defendants and unindicted co-conspirators, having received notice and acquired knowledge of the fact that an arrest warrant for Michael J. Meisner had been issued under provisions of a law of the United States, would and did harbor and conceal him, so as to prevent his discovery and arrest.
 
 
 69
 12. It was further an object of said conspiracy, for the purposes stated in paragraph nine (9) above, the defendants and unindicted co-conspirators, knowingly made and caused to be made false material declarations under oath in proceedings before a Grand Jury of the United States.
 
 
 70
 13. Among the means by which the defendants and the unindicted co-conspirators would and did carry out the aforesaid objects of the conspiracy were the following:
 
 
 71
 (a) The defendants and the unindicted co-conspirators would and did plan, solicit, assist and facilitate the giving of false, deceptive, evasive and misleading statements and testimony;
 
 
 72
 (b) The defendants and the unindicted co-conspirators would and did give false, misleading, evasive and deceptive statements and testimony;
 
 
 73
 (c) The defendants and the unindicted co-conspirators, in order to limit the investigation by exposing only GERALD BENNETT WOLFE and Michael J. Meisner to criminal prosecution and in order to prevent the uncovering of the true facts regarding the scope of their illegal activities, would and did plan, solicit, order, assist, encourage and facilitate the entry of a plea of guilty by Wolfe;
 
 
 74
 (d) The defendants and the unindicted co-conspirators, in an effort to harbor and conceal unindicted co-conspirator Michael J. Meisner, would and did plan, direct, order, and assist in his initial concealment, and later in his forcible removal to secure hiding places where he was kept under guard.
 
 
 75
 Indictment, pp. 23, 24, 25 (J.A. 368-70).
 
 
 76
 Count Twenty-three alleges that forty-five overt acts were committed by the defendants in furtherance of the conspiracy. Only No. Forty-two charges an overt act by Wolfe
 
 
 77
 (42) On or about June 10, 1977, within the District of Columbia, GERALD BENNETT WOLFE, testified falsely before a Grand Jury of the United States District Court investigating the illegal entries into the United States Courthouse. WOLFE then reported to the Guardian's Office-DC where he was fully debriefed regarding his testimony before the grand jury. A copy of that debriefing was sent to the defendants and unindicted co-conspirators in Los Angeles and elsewhere.
 
 
 78
 Indictment, pp. 32, 33 (J.A. 377-78).
 
 
 79
 When Count Twenty-three is read in the light of Meisner's 1977 statement to the government it is apparent that the conspiracy alleged is the one described in that statement. Wolfe says his prosecution for this conspiracy is barred by the government's agreement, in exchange for his plea of guilty to fraudulent use of a government seal, "not to charge (him) with any other possible violations arising out of three separate entries into this courthouse with another man in May and June of last year (1976) using a false and fraudulently obtained Internal Revenue I.D. card." (J.A. 73) We think however that a reasonable analysis of the plea bargain requires the conclusion that it has no such effect.
 
 
 80
 When the plea agreement was made and Wolfe entered his plea the government knew only that using a false I.D. card he had entered the United States Attorney's Office and used the United States Attorney's xerox machine. The government was ignorant of Wolfe's purpose and knew nothing about the scope of his criminal activities. As Wolfe's attorney told the court at the sentencing, the case was only one in which Wolfe and another man under the influence of alcohol "decided to play around with the identification machines" (J.A. 89) and there was no evidence that the prosecutor's files "had been rifled in any manner." (J.A. 100) We assume that counsel spoke in good faith, but Wolfe knew that his statement misrepresented the facts. The prosecutor agreed with counsel's statement, and said that the government was "concerned about this case primarily because of what it (did) not know". (J.A. 92) The government did not know that on the day after he entered his plea Wolfe would tell a false story to the grand jury. Nor did the government know anything about the broad conspiracy in which Wolfe played a part, to obstruct justice and harbor and conceal the fugitive Meisner as alleged in Count Twenty-three. Yet Wolfe contends that the conspiracy is an offense within the contemplation of the plea agreement as an offense "arising out of" his courthouse entries. His contention offends common sense. It is too plain for argument that the conspiracy was not an offense contemplated by the plea agreement because the existence of the conspiracy, and all its details, although known to Wolfe, were deliberately concealed by Wolfe when his plea was accepted. If Wolfe's theory is sound then he could not be prosecuted for his perjury before the grand jury; indeed he could not have been prosecuted for murder had the conspirators done away with Meisner in order to silence him. An interpretation of the agreement that would lead to such results is unreasonable.
 
 
 81
 Wolfe relies heavily on United States v. Phillips Petroleum Co., 435 F.Supp. 622 (N.D. Okl. 1977), but this case does not help him. Phillips pled guilty to making an illegal campaign contribution, a misdemeanor, in violation of 18 U.S.C. § 610 (1970). Thereafter in Count I of an indictment the company was charged with conspiracy to defraud the government in violation of 18 U.S.C. § 371 (1976). There was no formal plea agreement but after taking extensive testimony the District Court found as a fact that it was understood that in return for the plea of guilty of the misdemeanor in violation of 18 U.S.C. § 610 (1970) there would be no further prosecution for any violation of 18 U.S.C., although there might be additional charges under the Tax Code, 26 U.S.C. It is true that in a pleading Phillips alleged that "the Special Prosecutor agreed that there would be no further prosecutions for any Title 18 violations arising from the contributions...." (Emphasis added) Id. at 624. However, the ground of the court's decision was not that the violation alleged in Count I arose out of the contributions; rather the court held that any charge of a Title 18 violation was barred. Furthermore, contrary to Wolfe's statement that his "situation is directly analogous to Phillips Petroleum" (Br. p. 39) the court emphasized that the conduct alleged in Count I was disclosed to the Special Prosecutor before the plea was entered. The court held, id. at 636, 637, "because the conduct alleged in Count I was disclosed to the Special Prosecutor before the plea was entered, the prosecution for the conduct alleged in Count I of this indictment and charged under Title 18 of the United States Code, is barred by the terms of the plea agreement."
 
 
 82
 Wolfe says the District Court should have conducted an evidentiary hearing to determine the terms of the plea agreement and whether it barred Wolfe's prosecution. In support of this contention he cites cases in which the terms of a plea agreement were not reduced to a formal statement, but depended upon conversations and understandings between defense and prosecution. See United States v. Phillips Petroleum Co., supra; United States v. Minnesota Mining & Manufacturing Co., 551 F.2d 1106 (8th Cir. 1977); United States v. Carter, 454 F.2d 426 (4th Cir. 1972), cert. denied, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974). Such cases have no application here where the plea agreement was formally stated in open court and confirmed by the defendant's attorney and the court. The only question is whether the plain terms of the agreement barred Wolfe's prosecution, and we hold they did not. Although Wolfe argues that he was entitled to testify as to his "subjective belief" concerning the scope of the agreement, this argument must be rejected. The scope of the bargain did not depend upon Wolfe's belief. United States v. Thomas, 593 F.2d 615 (5th Cir. 1979), cert. denied, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). The court said in that case, id. at 623,
 
 
 83
 (I)n determining the scope of a plea bargain, we cannot use a subjective standard ... The test, as applied to this particular issue, is whether "the evidence viewed objectively would lead one in the position of the defendants to reasonably conclude that the (nolo) pleas would be fully dispositive of all federal criminal matters." United States v. Minnesota Mining & Manufacturing Co., 551 F.2d 1106 (8th Cir. 1977). Although we do not doubt that appellants would have liked for the plea agreement to dispose of all criminal matters then under investigation, we cannot conclude that such an expectation was reasonable viewing the evidence objectively.
 
 WOLFE'S GRAND JURY APPEARANCE
 
 84
 As we have said Wolfe was subpoenaed to appear before the grand jury immediately after he was sentenced. He did appear, accompanied by his attorney, who waited outside while Wolfe testified. During the questioning of Wolfe four recesses were taken, including one for the specific purpose of allowing Wolfe to consult with his attorney. With one unconsequential exception[9] all the questions put to Wolfe during his grand jury appearance related to the details of the three courthouse entries, the reasons for those entries and the entry into IRS to obtain the false credentials, Wolfe's association with and knowledge of "Foster", and an exploration of the evasive and contradictory answers Wolfe gave in response to the questions. It became apparent that Wolfe's testimony and explanations were untruthful.
 
 
 85
 Wolfe complains that his testimony before the grand jury was "compelled" and was thereafter used against him. He says he was not given a Miranda warning but was told that he had no right to claim the protection of the fifth amendment. In addition he contends that during his appearance he was harassed by the prosecutor who ridiculed his testimony and made improper comments about it. We are not impressed by the complaints.
 
 
 86
 It is established law that because a witness has been found guilty of the actions in question he is no longer entitled to claim the privilege of the fifth amendment with respect to those matters and he may be compelled to testify about them. United States v. Skolek, 474 F.2d 582 (10th Cir. 1973); United States v. Hoffman, 385 F.2d 501 (7th Cir. 1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); United States v. Gernie, 252 F.2d 664 (2d Cir.), cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958); United States v. Romero, 249 F.2d 371 (2d Cir. 1957). Thus, by virtue of his plea of guilty and the plea agreement Wolfe had no fifth amendment privilege with respect to his entries into the courthouse, and the prosecutor was entirely correct in telling him so. Since the prosecutor's questioning related to those matters it would have been inappropriate to preface the questioning by a Miranda warning. In any event Wolfe's counsel accompanied him to the grand jury room, was present outside throughout the hearing, and was consulted by Wolfe at least once during the questioning. In these circumstances Wolfe's complaint that he failed to receive a Miranda warning has a hollow ring.
 
 
 87
 The fallacy of Wolfe's contention that his grand jury testimony was "compelled" becomes apparent when we recall that his testimony was in substance the same "cover-up" story he had given to the prosecutor a year before. As part of the conspiracy he had agreed to tell that story, and he told it as his voluntary contribution to the conspiracy. Any "compulsion" was applied, not by the government, but by Wolfe's agreement to perjure himself in furtherance of the conspiracy.
 
 
 88
 Wolfe contends that the indictment should be dismissed because of the prosecutor's misconduct before the grand jury, and because the prosecutor misinformed Wolfe's attorney as to the scope of the grand jury questioning. With respect to these complaints it is enough to say that we have reviewed the record, including the transcript of Wolfe's grand jury testimony, and we can find no fault with the prosecutor's conduct. It is true that the questioning of Wolfe was sharp and persistent, but a prosecutor is under no obligation to soothe a witness who is obviously evasive and untruthful.
 
 II. THE SEARCH-SEIZURE ISSUES
 
 89
 The search and seizure operation with which we are concerned in this appeal involved over 200 FBI agents and government personnel[10] who spent over 20 hours examining the files and papers maintained in two California offices of Scientology. Pursuant to a warrant which specified 162 separate descriptions of seizable documents relating to several offenses, the agents entered a number of rooms in two large buildings, and searched numerous file drawers, desk drawers and tops, boxes and closets. Appellants contend that the searches and seizures violated the fourth amendment.
 
 
 90
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 91
 U.S. Const. amend. IV.
 
 
 92
 However, the magnitude of the search is not enough by itself to establish a constitutional violation. Instead, "(o)ur fundamental inquiry in considering Fourth Amendment issues is whether or not (the) search or seizure is reasonable under all the circumstances." United States v. Chadwick, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977).[11] In this case, "all the circumstances" include not only the scope of the warrant and the behavior of the searching agents, but also the conditions under which they had to conduct the search, and the particular nature of the evidence being sought in relation to the underlying offenses. This court has recognized that although the crimes of conspiracy and obstruction of justice may present law enforcement officers with difficult evidence-gathering problems, such difficulties do not prevent the use of comprehensive search warrants designed to obtain all relevant documentary evidence.
 
 
 93
 (C)onspiratorial crimes are conducted with more secrecy than many other crimes, and search warrants that seek evidence of conspiracy, and otherwise meet the required standards, may extend to all relevant evidence of that crime. Otherwise, alleged conspirators would occupy a special protection from prosecution that is not available to other accused persons. The same may be said of search warrants seeking relevant evidence of obstruction of justice. Neither of these offenses possess any special immunity which would protect them from being ferreted out by proper search warrants seeking relevant evidence. While these offenses may have certain subjective elements, ... the evidence that proves such subjective elements may be objective, tangible and constitute clear proof.
 
 
 94
 In re Search Warrant Dated July 4, 1977, 572 F.2d 321, 328 n.4 (D.C.Cir.1977), rehearing en banc denied, 572 F.2d 328 (D.C.Cir.), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). See also Andresen v. Maryland, 427 U.S. 463, 481 n.10, 96 S.Ct. 2737, 2749 n.10, 49 L.Ed.2d 627 (1976).
 
 
 95
 After careful consideration of defendants' claims against the warrant and its inherently difficult execution, we conclude that the warrant was valid and that its execution satisfied the ultimate constitutional requirement of reasonableness. See sections B and C, infra.
 
 A. Factual Summary
 
 96
 Although the facts relevant to each legal issue are discussed in context, a brief overview of the search and seizure operation is appropriate here.
 
 
 97
 On July 8, 1977, three search warrants were simultaneously executed for premises owned and operated by the Church of Scientology: one for Washington, D.C., the other two for the Fifield Manor[12] and the Cedars-Sinai Complex[13] in Hollywood, California. Since the evidence introduced at defendants' trial was obtained from the Hollywood searches, not from the Washington search,[14] this opinion is concerned only with the validity of the former. The search warrants were based upon a 33-page sworn affidavit[15] which set forth the results of the government's investigation into charges that various officials of Scientology, including defendants, had conspired to steal-and had stolen-documents belonging to the federal government, and further had conspired to obstruct justice by covering up these crimes during a grand jury investigation of a burglary of the office of an Assistant United States Attorney in the United States Courthouse in Washington, D.C.
 
 
 98
 On July 7, 1977, the day before the searches took place, various supervisory and legal personnel from the FBI's Los Angeles office, and others from the U.S. Attorney's office in Washington, conducted a briefing for the agents who had been selected to participate in the searches of Fifield Manor and the Cedars-Sinai Complex. At six a.m. on July 8, teams of agents entered both Fifield Manor and Cedars-Sinai to execute the search. The Fifield Manor search-the smaller of the two-covered a four-room area around defendant Henning Heldt's office on the sixth floor, his personal office, a large secretary's office, the office of his assistant (defendant Snider), and an adjoining but separated "penthouse" room. Within this area the agents searched approximately eight four-drawer file cabinets, one two-drawer file cabinet, five desks, three closets, and various piles of documents and papers. They also searched, but seized nothing from, an adjoining telex room. All told, the agents seized approximately 430 documents from Fifield Manor.[16]
 
 
 99
 The Cedars-Sinai search was far more extensive. Although over 50 agents were initially assigned to this search operation,[17] by mid-morning the supervising agents decided that the number of agents on hand was insufficient.[18] Accordingly, approximately 50 additional agents-who had not been briefed the day before-were added to the search teams.[19] Agents remained on the site searching well into the night, in over thirty rooms, and examined hundreds of filing cabinets, boxes, desks, wall cabinets, and assorted loose documents. In all, between 23,000 and 47,000[20] separate documents were seized from Cedars.
 
 
 100
 Immediately following the execution of the warrants, the Church filed two separate actions in Los Angeles and in the District of Columbia seeking return of the seized property pursuant to Fed.R.Crim.P. 41(e).[21] Neither action effected a return of all the documents.[22] On August 15, 1978, defendants were indicted by a federal grand jury in the District of Columbia. Defendants urged the district court below to suppress all evidence seized in the California operations. After holding hearings in both Los Angeles and in Washington, and viewing personally the searched premises in Hollywood, the district court held the California searches and seizures to be reasonable and refused to suppress any of the fruits thereof.
 
 
 101
 B. Fourth Amendment Interests Implicated in This Case
 
 
 102
 The fourth amendment serves to protect two distinct interests. See generally Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (plurality opinion of Stewart, J.). First, the warrant requirement seeks to guarantee that any searches intruding upon an individual's privacy must be justified by probable cause, as determined by a "neutral and detached magistrate."[23] Second, where probable cause is found and a warrant issues, the particularity requirement seeks to assure that
 
 
 103
 those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.
 
 
 104
 Id. As the Supreme Court stated decades ago,
 
 
 105
 (t)he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.
 
 
 106
 Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 1016 (1927).
 
 
 107
 Of course, even when the search warrant meets both the probable cause and particularity requirements, the search itself must be conducted in a reasonable manner,[24] appropriately limited to the scope and intensity[25] called for by the warrant. See Terry v. Ohio, 392 U.S. 1, 17-18, 88 S.Ct. 1868, 1877-1878, 20 L.Ed.2d 889 (1968) ("This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope."); id. at 28-29, 88 S.Ct. at 1883-1884; United States v. Rettig, 589 F.2d 418, 423 (9th Cir. 1978); United States v. Clark, 531 F.2d 928, 931 (8th Cir. 1976). When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity. Obedience to the particularity requirement both in drafting and executing a search warrant is therefore essential to protect against the centuries-old fear of general searches and seizures.
 
 
 108
 Defendants' first claim is that the warrants for Fifield Manor and Cedars-Sinai were overbroad. We have already dealt with that argument in our opinion in In re Search Warrant Dated July 4, 1977, supra, which concerned the facial validity of the warrant to search Scientology's offices in Washington, a warrant identical in all material respects to the ones challenged here. Each of the warrants contained 162 descriptions of property subject to seizure. Items 1-99 listed documents alleged to have been stolen and copied from the office of an Assistant United States Attorney in Washington, D.C. Items 100-148 listed documents alleged to have been stolen and copied from an attorney at the Justice Department, also in Washington. Finally, Items 149-62[26] listed either internal documents of Scientology, or other allegedly stolen documents. With respect to Items 149-62, Scientology in In re Search Warrant contended that an agent would construe the warrant, for all practical purposes, as authorizing discretionary rummaging prohibited by the fourth amendment. See generally In re Search Warrant, supra, 572 F.2d at 324, 327 (per curiam), 330 (statement of Robinson, McGowan, JJ., on suggestion for rehearing en banc). We held, on authority of Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), that the warrant-when read in conjunction with the affidavit-was sufficiently specific and particularized, did "not leave to the executing officers impermissible discretion," and was in all other respects valid. In re Search Warrant, supra, 572 F.2d at 328. That determination controls this case.[27]
 
 
 109
 There remain, however, the issues related to the execution of the warrants.[28] Normally, criminal defendants seeking suppression on appeal allege that the particular evidence used against them at trial was unlawfully seized, and for that reason should not have been admitted. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Defendants here, however, make no such argument. They have made no attempt before this court to single out as unlawfully seized any of the 201 particular documents used against them at their trial.[29] Defendants argue instead that because the search as a whole was a general search, all documents therein seized must be suppressed. Defendants apparently have chosen to place all their hopes on an argument for total suppression, asserting that "(u)nless the exclusionary rule is held to require the suppression of all the fruits of a general search, there will be no restraint upon the conduct of such searches, and the core of the Fourth Amendment will have been eviscerated." App.Br. I at 117 (emphasis in original).
 
 
 110
 We recognize that in some cases a flagrant disregard for the limitations in a warrant might transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed. See generally United States v. Rettig, 589 F.2d 418, 423 (9th Cir. 1978); United States v. Fernandez, 430 F.Supp. 794, 801 (N.D.Cal.1976); United States v. Nine 200-Barrel Tanks of Beer, 6 F.2d 401, 402 (D.R.I.1925).[30] Cf. United States v. Tracy, 350 F.2d 658 (3d Cir.), cert. denied, 382 U.S. 943, 86 S.Ct. 390, 15 L.Ed.2d 353 (1965) (all evidence suppressed for disregard of limits on use of force). If in this case law enforcement officers had conducted a document search as if no limiting warrant existed, rummaging at will among defendants' offices and files, then the mere existence of a valid-but practically irrelevant-warrant for certain specified documents would not be determinative of whether the search was so unreasonable as to require suppression of everything seized. Defendants do show several instances where documents were seized outside the warrant, but they do not demonstrate such flagrant disregard for the terms of the warrant which might make the drastic remedy of total suppression necessary. Absent that sort of flagrant disregard, the appropriate rule seems to be that where officers seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant. See United States v. Forsythe, 560 F.2d 1127, 1134 (3d Cir. 1977) ("Assuming arguendo that the seizure of the items not listed in the warrant was illegal, this does not justify suppression of highly probative evidence consisting of those documents and records which were legally seized pursuant to a valid warrant."); United States v. Daniels, 549 F.2d 665, 668 (9th Cir. 1977); United States v. Artieri, 491 F.2d 440, 445-46 (2d Cir.), cert. denied, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974); United States v. Mendoza, 473 F.2d 692, 696-97 (5th Cir. 1972); United States v. Holmes, 452 F.2d 249, 259 (7th Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972). See generally United States v. Scott, 516 F.2d 751, 760 n.19 (D.C.Cir.1975), cert. denied, 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976) (dictum noting agreement with the rule.)
 
 
 111
 In the following section, we outline the standards for judging the reasonableness of a document search, and explain why the government's actions-taken as a whole-do not amount to a flagrant disregard of those standards.
 
 C. The General Search Issue
 
 112
 "(T)he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant(.)" Bivens v. Six Unknown Named Agents, 403 U.S. 388, 394 n.7, 91 S.Ct. 1999, 2004 n.7, 29 L.Ed.2d 619 (1971). In the context of document searches, the need to prevent "general, exploratory rummaging in a person's belongings"[31] is particularly acute. Unlike searches for other tangibles, document searches-like eavesdropping and bugging "searches"[32]-tend to involve broad disclosures of the intimacies of private lives, thoughts and transactions. The acute constitutional hazards of this sort of investigative activity have been recognized by the Supreme Court. In Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), which involved a search and seizure of a criminal defendant's office files, the Supreme Court stated:
 
 
 113
 We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.
 
 
 114
 Id. at 482 n.11, 96 S.Ct. at 2749 n.11 (emphasis supplied).[33]
 
 
 115
 This court implicitly recognized the importance of the Andresen minimization requirement in our earlier decision concerning the Washington warrant. The court held the warrant valid, but did so expressly and repeatedly on the ground that a study of the accompanying affidavit would make the search warrant sufficiently particular and specific so as to avoid the danger of a general search. In re Search Warrant Dated July 4, 1977, supra, 572 F.2d at 324, 325, 326, 327. Since the permissible intensity of any search is determined by the description of the things to be seized,[34] the court's explicit references to the particulars in the affidavit indicated our intention that the execution of this document search be confined to those particulars, so that it would not become simply a grant of " 'authority to the agents to search for and seize any evidence of conspiracies to steal government property and to obstruct justice....' " Id. at 324 (original emphasis). The court described that latter broad construction as being "patently incorrect," and noted that "(t) he recited facts and designations of property and offenses impose particular limits upon the search warrant ...." Id. It is undoubtedly true that a shorter, more clearly delimited warrant might have made the agents' duty to properly limit their search easier to fulfill. But the question now is not whether the warrant could or should have been more narrowly confined; rather, given the broad scope of this already approved warrant, the question here is whether the searching agents properly confined themselves to its terms when conducting their search. A proper execution of a search warrant for numerous documents requires three things: adequate preparation; obedience to area limitations; and restrictions on seizure of items not mentioned particularly in the warrant. We discuss each requirement, and the degree to which it was adhered in this case, below.
 
 
 116
 1. Adequate preparation.
 
 
 117
 Warrants are not self-executing; they require agents to carry them out. In order for a warrant's limitations to be effective, those conducting the search must have read or been adequately apprised of its terms.[35] Where, as here, the terms are numerous, complex, and potentially overbroad unless limited by the specifications of an extensive affidavit, the need for careful preparation on the part of those searching is essential.[36] In this case we are convinced that most of the agents conducting the search were provided with as much preparation and information as was reasonable under the circumstances to enable them to carry out the warrant's complicated terms.[37] On the other hand, some 50 agents who arrived at Cedars-Sinai during the afternoon were given neither a meaningful opportunity to read the warrant and affidavit, nor any sort of comprehensive briefing of their terms, before beginning their mission.[38] In conducting a search of this complexity and magnitude the agents should be familiar with the general nature of the crimes that are charged and the list of items they are authorized to seize, either through reading of the warrant or through adequate instructions or supervision from those in charge. If a supplementary document like an affidavit is essential to properly understand the limitations of the warrant, see text at 1244 supra, then its contents must be examined, or else communicated to the agents by their supervisors.[39] Minimization designed to control the proper scope of the search cannot occur without such knowledge.
 
 
 118
 Nonetheless, though the facts here in some respects approach the limits of constitutional acceptability, we do not believe that the arrival of a supplementary contingent of inadequately prepared agents in this particular case resulted in a general search which might require the exclusion of all seized documents. Those agents who received inadequate information initially, and who were brought in only after the supervising agents on the scene determined that additional manpower was required,[40] always represented less than half the total of those searching at Cedars-Sinai.[41] The agents operated in teams and there is no evidence that the first group of agents, or the late arriving agents, were not adequately supervised. They were instructed that if they had questions regarding particular documents, they should seek out their search team leaders who would determine whether the documents fell within the scope of the warrants;[42] such consultations occurred frequently throughout the operation.[43] They were also informed that copies of the warrant and affidavit would be available for their use within the search area.[44] Even more important, the late-arriving agents worked alongside and in conjunction with others[45]-both supervisors and searches-who had been satisfactorily briefed, who had reviewed the warrant and affidavit and had them in their possession,[46] and who assisted the newcomers in their choice of documents to be seized.[47] As a final measure, the leaders of the search reviewed many of the documents initially seized by the new agents in order to compare them to the warrant's particulars, before listing them in the inventory of items to be seized.[48] Thus, on the whole, we conclude that the inadequate initial preparation of some agents, though disturbing, did not so taint this search as to convert it into a general rummage for evidence, and we therefore decline to order complete suppression on this basis.
 
 
 119
 2. Area limitation.
 
 
 120
 A second limitation upon searches concerns the area to be covered by the search operation itself. It is well accepted that the authority to search granted by any warrant is limited to the specific places described in it, and does not extend to additional or different places. See, e.g., Keiningham v. United States, 287 F.2d 126, 129 (D.C.Cir.1960); United States v. Principe, 499 F.2d 1135, 1137 (1st Cir. 1974); 2 W. LaFave, Search and Seizure § 4.10 (1978). In this case the only serious allegation of geographic overbreadth[49] is raised by defendant Mary Sue Hubbard, and concerns Mrs. Janet Lawrence's office in Fifield Manor.
 
 
 121
 The Fifield Manor warrant authorized a search of "the suite of offices of Mr. Henning Heldt(.)" The warrant also stated that "(t)he office of Mr. Henning Heldt ... is located on the sixth floor, the last office on the left-hand side of the corridor to the right of the elevator." J.A. at 155. No one else's office was authorized to be searched at Fifield Manor. Mrs. Lawrence's office, a free-standing penthouse room, or hut, built out on top of the roof extending outside Mr. Heldt's office,[50] was not mentioned in the warrant; yet her office was searched and many documents therein seized. The question is whether or not her office could reasonably have been viewed by the searching agents as constituting part of "the suite of offices of Mr. Henning Heldt(.)"
 
 
 122
 Appellants contend that it could not for several reasons. First, the agents who conducted the search, in their "302 forms" (dictated on July 8 and 14) describing the location from which documents were taken, designated the hut as "the office of Janet Lawrence."[51] Second, Mrs. Lawrence informed the agents that the hut was her office, not Mr. Heldt's, and that she did not work for Mr. Heldt.[52] Despite her statement, and despite the lack of any information which might have contradicted Mrs. Lawrence, including any marking or identification on the hut, the agents ignored her and demanded entry. The most important factor, however, is contended to be the physical discontinuity of the Heldt suite and the Lawrence office.[53] To reach the latter from the former the agents had to go outside onto the roof of the Manor, and approach the free-standing penthouse structure, which was approximately nine feet from Heldt's office windows. Since the penthouse office was independently locked, access to the Heldt offices would not also provide access to it. Further, it is undisputed that the structure could be easily reached without ever entering the Heldt suite of offices.[54]
 
 
 123
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 124
 These contentions were responded to by the District Court which examined the premises and found in United States v. Hubbard, supra, 493 F.Supp. at 226, 227:
 
 
 125
 The only controversial question with respect to the scope of the Fifield Manor search was the activity in Janet Lawrence's office and the telex room. In deciding this issue, the Court was greatly aided by the view of the premises taken at the defendants' request. As one enters the inner office of Henning Heldt, one is struck by the appearance of a hut across the terrace of the roof.15 Access to the hut is available through French doors in the Heldt office. From the vantage point of an agent attempting to locate the boundary of the Heldt suite, it would be reasonable to assume that this hut, right outside the doors of the Heldt office, would be part of the suite. Much has been made of the strict definition of a "suite." Webster's Third New International Dictionary defines "suite" as "a series or group of things forming a unit or constituting a complement or collection: SET: as a (1): a group of rooms designed for occupancy as a unit." Since the nearest entrance to the hut was through the office of Henning Heldt, it was logical to assume that those offices formed a unit. In fact, Janet Lawrence testified that she, and her co-workers in the hut, had to use the restroom in the Heldt office. Trans. of August 29, 1979 at 326. She further testified that on the day of the search the office was unmarked ; thus, there was nothing to indicate that it did not constitute part of the Heldt suite. Trans. of August 29, 1979 at 346-47. (Emphasis added).
 
 
 126
 The statement of Mrs. Lawrence that the hut was not Heldt's office was hardly the statement of an unbiased witness who should have been permitted to lay down the boundaries for the agents' search. Access to the penthouse could be had through the French doors in Heldt's private office, nine feet from the penthouse entrance, and the bathroom used by the occupant of the penthouse was in the Heldt office. The long route to reach the "Lawrence" room does not impress us as a reasonable alternative.
 
 
 127
 These factors taken together convince us that entry into Lawrence's office was not outside the area limitation of the Fifield Manor warrant. The District Court's finding to that effect is not clearly erroneous and must be sustained. See generally Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); United States v. Rischard, 471 F.2d 105, 107 (8th Cir. 1973); United States v. Tallman, 437 F.2d 1103 (7th Cir. 1971); United States v. Nardone, 127 F.2d 521 (2d Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942). Evidence seized therefrom was therefore properly seized. The defense, moreover, has conceded that none of the documents seized from Mrs. Lawrence's office were used as evidence-in-chief by the prosecution,[55] and has failed to make even a colorable argument that they were used in any other fashion by the government. Cf. Br. for App. Hubbard at 64-5. Seizure of documents from Lawrence's office thus did not affect defendants' conviction in any way. And this search does not constitute evidence of flagrant disregard for the warrant. The agents did not act capriciously or wantonly in searching the Lawrence office. On the contrary, they entered only after an Assistant United States Attorney was consulted by the agents in charge, and a deliberate, collective decision was made to proceed,[56] a decision not without some good faith, rational basis.[57] The search of Mrs. Lawrence's office therefore was valid and does not constitute evidence of a general search requiring suppression of documents seized from the Heldt suite at Fifield Manor. See cases cited at pp. 1259-1260, supra.
 
 
 128
 3. Seizing Items Not Mentioned in the Warrant-Limitations on the Plain View Doctrine
 
 
 129
 We have already noted that the particularity requirement of the fourth amendment "prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). Thus, in general, only items particularly mentioned in the warrant may be seized. See, e.g., United States v. Bills, 555 F.2d 1250, 1251 (5th Cir. 1977); United States v. Dzialak, 441 F.2d 212 (2d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); United States v. Alloway, 397 F.2d 105, 110 (6th Cir. 1968). See also United States v. Kirschenblatt, 16 F.2d 202, 203-04 (2d Cir. 1926). Applying this rule with unmitigated rigor, however, would preclude the seizure of any item, no matter how obviously incriminating at a glance, simply because the searching officer happened to be glancing pursuant to a search warrant. In Coolidge v. New Hampshire, supra, a plurality of the Supreme Court found that under certain circumstances the police may seize objects in "plain view" when they are searching pursuant to a warrant, even though the warrant does not specify those objects. The Justices recognized, of course, that an expansive interpretation of the plain view exception might swallow the rule of particularization, since
 
 
 130
 any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.
 
 
 131
 Coolidge v. New Hampshire, supra, 403 U.S. at 465, 91 S.Ct. at 2037 (original emphasis).
 
 
 132
 Unless these circumstances are identified and applied, any warrant authorizing a search for a particular document might, in conjunction with the plain view exception, permit "a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant." Stanley v. Georgia, 394 U.S. 557, 572, 89 S.Ct. 1243, 1251, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring). Clearly, the plain view exception must be defined in such a way as to preclude using a document search warrant as authority to search for and seize all evidence of wrongdoing in the form of documents which happen to be located at the search site.
 
 
 133
 Based upon Coolidge, courts have formulated three limitations upon the plain view exception. First, the searching agents must lawfully be in the location where their plain viewing occurs, i.e., seizures based upon plain view can occur only within the geographical limitations set out, or implied, in the warrant.[58] Second, any seized item unspecified in the warrant must possess an incriminating character plainly and immediately apparent on its face, a character sufficiently incriminating to establish probable cause for its seizure despite the absence of a warrant mentioning it. Third, the searching agents must come upon the unspecified items inadvertently. We find the first limitation satisfied, and turn immediately to the latter two.
 
 
 134
 The requirement that items seized under plain view must display a plain, immediately apparent incriminating character derives from the need to protect the integrity of the warrant and prevent against random rummaging.
 
 
 135
 (T)he extension of the original justification (for the search warrant) is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from object to another until something incriminating at last emerges.
 
 
 136
 Coolidge v. New Hampshire, supra, 403 U.S. at 466, 91 S.Ct. at 2038. Many courts have applied this limitation of cases involving seized documents where the warrant authorizing the search did not specify them. See, e.g., United States v. Ochs, 595 F.2d 1247, 1257 & n.8 (2d Cir.), cert. denied, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (numerous cases cited). The incriminating character limitation necessarily permits a brief perusal of documents in plain view in order to determine whether probable cause exists for their seizure under the warrant. See generally id. at n.8 (cases cited). If in the course of that perusal, their otherwise incriminating character becomes obvious, they may be seized. Id. See Mapp v. Warden, 531 F.2d 1167, 1172 (2d Cir.), cert. denied, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976) ("it would be somewhat absurd to require an investigator to be oblivious to that which would be apparent to anyone else with normal powers of observation"). Otherwise, the perusal must cease at the point at which the warrant's inapplicability to each document is clear. Searching officers may not cart away documents unspecified by the warrant which simply look somewhat suspicious, comb through them carefully at their leisure and then return them if they do not constitute evidence of criminal activity. That sort of abuse would return us to the days of the general warrant and must be scrupulously avoided.
 
 
 137
 The other, closely related limitation on the admission of unspecified documents seized under a search warrant is that of inadvertence.[59] This requirement has been subjected to substantial scholarly criticism, e.g., 2 W. LaFave, Search and Seizure § 4.11(d) (1978); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 244-46 (1971), and has been unevenly applied by courts. Compare, e.g., United States v. Davis, 542 F.2d 743, 745 (8th Cir.), cert. denied, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), and United States v. Wysong, 528 F.2d 345 (9th Cir. 1976) (both courts characterize as "inadvertent" discovery of items as to which it appears police could have made showing of probable cause to seize, but failed to do so), with United States v. Winston, 373 F.Supp. 1005, 1007 (E.D.Mich.1974) (seizure of item cannot be "inadvertent" if, before searching begins, police have probable cause to seize it). In the context of this case we believe the inadvertence limitation stands for the simple proposition that agents must not be searching for items outside the particulars of the warrant when they conduct the search; in other words, agents must act in good faith to confine themselves to searching for the specified items.[60] If, while conducting a search reasonably designed to find the specified items, an agent observes an unspecified item for which probable cause to seize exists on its face, he may seize it. He may not, however, seek a warrant or conduct his search for the purpose of looking for items not included in the warrant; rather, if he finds and seizes such items, he must do so truly "inadvertently."
 
 
 138
 Applying the good faith/inadvertence limitation in this case, we find no persuasive evidence that the search was merely a subterfuge to examine or seize other evidence not specified in the warrant. See United States v. Hubbard, supra, 493 F.Supp. at 231. On the contrary, it appears that the agents, in their preparation and execution of the search, intended to look only for evidence concerning the offenses alleged in the warrant and affidavit, specifically, evidence which was arguably within the scope of Item 162 if not within the other 161 items.[61]
 
 
 139
 Turning to the question of compliance with the immediately apparent incriminating character requirement, we note that the district court failed to note with specificity how many documents were taken pursuant to the plain view doctrine, or how many of those seized under plain view actually met the incriminating character requirement. The court did decide that "red-box data," and other documents discussing infiltration and covert operations directed against private and state organizations, satisfied this limitation. Id. at 231-33. But it did not discuss numerous other documents alleged not to have possessed an immediately apparent incriminating character, and admitted frankly that "(p)erhaps some documents were seized outside the warrant." Id. at 234. For their part, defendants allege that up to 71% of the documents were outside the particulars of the warrant, and thus their seizure could be justified only on the basis of plain view;[62] they make no effort, however, to estimate how many of these alleged "plain view documents" were seized in violation of the incriminating character limitation. The court found the basis for the 71% figure to be "valueless due to basic analytical flaws in (the) interpretation of the warrant." 493 F.Supp. at 233. The Scientology claim was also based on a random sample of only 400 documents out of 23,000 that were evaluated by a law firm representing appellants and by fifty "clerks" all of whom were members of the Church of Scientology (Tr. July 17 at 5075-80, 5103). While we do not accept the defendants' figure as necessarily accurate, and while we recognize the district court's finding that at least some of the "plain view documents" satisfied the incriminating character limitation, this still leaves us with the possibility that many documents were improperly seized under the plain view doctrine.
 
 
 140
 Assuming arguendo that numerous documents not specifically discussed by the district court in its treatment of plain view failed to meet the incriminating character limitation,[63] we would still not hold that total suppression is required in this case. Although it certainly would have been preferable to have had a finding based upon an actual examination of the questioned documents, we believe here that the reasonableness of the execution of a search can be determined from the subjective and objective behavior of the participants during the search, as revealed by eyewitness testimony.[64] The end result of the search certainly is a legitimate factor to consider in evaluating its overall reasonableness, but it is not always an indispensable ingredient of the decision. Thus a good faith attempt to stay within the boundaries of an inherently broad warrant will support a finding that the search-taken as a whole-was reasonable, even though a majority of documents seized might turn out not to qualify for inclusion on more leisurely reflection. We must emphasize at this point, however, that our concern with the agents' obedience to the limitations of the warrant relates solely to determining whether a violation of such egregious magniture occurred that all fruits of the search must be suppressed. See p. 1243 supra. If particular documents seized under the plain view exception had been admitted as evidence-in-chief against defendants and the admissibility of those documents had been put in issue before us, an entirely different analysis would be required.
 
 
 141
 In conclusion, despite the possibility that some (unspecified) documents seized under plain view failed the incriminating character requirement, we hold that the searches of Fifield Manor and Cedars-Sinai were not so unreasonable that total suppression is required. Nor, so far as we can tell, were any documents which were admitted into evidence against defendants seized in violation of the area or plain view limitations discussed above. Hence, by way of a somewhat different rationale, we affirm the district court's conclusion that the seized documents in this case need not be suppressed.
 
 III. DISQUALIFICATION OF THE TRIAL JUDGE
 
 142
 Just prior to sentencing on December 4, 1979, the defendants moved pursuant to sections 144 and 455 of Title 28 to recuse the trial judge from the sentencing process. The principal ground upon which the motion was made was a claim that the trial judge had deceptively concealed from the defendants the cause of the security measures taken during the Los Angeles proceedings.[65] In a memorandum opinion filed on December 14, 1979, the court denied the motion upon a number of grounds. First, the court held the motion untimely. Second, the court found that defendants did not file an affidavit of personal bias or prejudice as required by 28 U.S.C. § 144. Finally, the court concluded that the security measures it took in Los Angeles would not lead a reasonable person to question the court's impartiality. United States v. Hubbard, Cr. No. 78-401 (D.D.C. December 14, 1979) (memorandum denying motion for evidentiary hearing and recusal).
 
 
 143
 The defendants contest the trial court's conclusions. They argue that their motion was timely because it was filed within a short time after they discovered "evidence of deception." In addition, they contend that the judge's concealment of the reasons for the security measures gives "rise to an inescapable inference of bias against the defendants." Appellant's Brief II at xvii.
 
 
 144
 Although appellants moved pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455, they have essentially abandoned their argument to the extent it is based on section 144, see Appellants' Reply Brief II at 2 n.1, probably because their motion was not accompanied by the affidavit of a party as required by that section. Appellants correctly note, however, that section 455 does not require the filing of an affidavit, and, since recusal can be sustained under that section on the same ground that exists in 144, appellants have lost little by dropping their section 144 claim.
 
 
 145
 Section 455, as amended in 1974, contains two provisions pertinent to this case. Subsection (a) states:
 
 
 146
 Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 Subsection (b)(1) adds:
 
 147
 He shall also disqualify himself in the following circumstances:
 
 
 148
 Where he has a personal bias or prejudice concerning a party ....
 
 
 149
 28 U.S.C. § 455(a), (b)(1).
 
 
 150
 Appellants' claim of bias is largely dependent on the following exchange between court and counsel, which occurred on the first day of the Los Angeles hearing:
 
 
 151
 MR. NUSSBAUM: Your Honor ... I have never been involved in a case before where there were unusual security measures, so I don't really know why they are made, and how far they ought to go.
 
 
 152
 MR. NUSSBAUM: Nothing untoward has happened, as the Court is aware of, that we might not be aware of, to explain the security measures?
 
 
 153
 THE COURT: No.
 
 I will merely say this:
 
 154
 That this Court, along with, as you know, some of the other judges of my Court, has been under special security-maybe you don't know it-under special security that is unrelated to this case.
 
 
 155
 That is why some marshals are with me now, and have been for a considerable period of time.
 
 
 156
 Tr. 7/3/79 at 11-12.
 
 
 157
 Defendants contend that the court's response was untrue in a number of respects. First, they suggest that neither Judge Richey nor any of his colleagues had been under any special security prior to the hearing. Second, they posit that the marshals had not been with Judge Richey for a considerable period of time. Third, they submit that the special security was in fact related to their case.
 
 
 158
 Having discovered this evidence of deception, the defendants argue that a number of other occurrences took on a different light-they refer to the "hallway incident," the "first elevator incident," the "second elevator incident," the denial of jury venire information, the disposition agreement and the release of documents, and, finally, the sentencing itself. Before turning to the substance of appellants' claim, we must first consider whether appellants' motion was timely filed.
 
 
 159
 The trial judge's conclusion that defendants were tardy in bringing their motion to recuse does not lack support in the record. Their claim that several incidents suddenly took on a different light once they learned that the trial judge had misled them concerning the reasons for the security in Los Angeles appears somewhat disingenuous. Even if we assume that those incidents are probative of prejudice or bias, we cannot believe that the dim light shed upon these matters by the discovery of an alleged falsehood perpetrated by the judge is sufficient to make the innocent appear evil. Moreover, it would appear that at least some of the evidence upon which appellants rely to demonstrate the judge's deception was known by or available to them at the time of the contested statement. Appellants note that "(a) federal security officer was posted on the roof of the courthouse with an AR-15 automatic rifle and binoculars. Counsel were informed that he was there because of 'the Scientology case.' " Appellant's Brief II at 2 n.3 (citing Motion for Evidentiary Hearing and for Recusal at 4) (J.A. 1121).
 
 
 160
 Although section 144 contains an explicit timeliness requirement, section 455 has none. There is some disagreement over whether section 455 contains an implicit requirement of timeliness. Compare In re International Business Machines Corp., 618 F.2d 923, 932 (2d Cir. 1980) (timeliness requirement) with SCA Services, Inc. v. Morgan, 557 F.2d 110, 117 (7th Cir. 1977) (no timeliness requirement). In the present circumstances, since the tardiness of appellants' motion is not entirely free of doubt, we choose not to reach this question. Instead, we will address the issue of disqualification as if it had been raised in a timely fashion by the parties or the court had sua sponte considered it. We therefore turn to an examination of the requirements imposed by the recusal statute.
 
 
 161
 Now that section 455 contains a provision calling for disqualification in a "proceeding in which (a judge's) impartiality might reasonably be questioned,"[66] we join our sister circuits in concluding that a showing of an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question a judge's impartiality is all that must be demonstrated to compel recusal under section 455.[67] A showing of the appearance of bias or prejudice would seem necessarily to raise a reasonable question concerning the judge's impartiality. We must therefore test appellants' motion on the basis of whether or not they have established an appearance of bias or prejudice, as judged by an objective standard.
 
 
 162
 We note initially that section 455 gives no guidance concerning procedure.[68] Under section 144, the judge must determine the legal sufficiency of the affidavit required by that section accepting as true the facts stated with particularity therein. If those facts demonstrate bias, the judge must recuse himself. Section 455, since it imposes a duty directly upon the judge to evaluate his own conduct, requires no affidavit, and as noted supra, appellants did not file one in the district court. Their motion was accompanied by a memorandum of law, which contained allegations of fact that were verified by one of the defense counsel. We must decide how a trial judge should treat such a motion made for recusal pursuant to section 455.
 
 
 163
 Preliminarily, there is no support for the position that the facts alleged in the papers submitted by a person relying on section 455 must in every case be accepted as true, whether the papers be a verified memorandum or are in some other form. The very fact that section 455 is addressed directly to the judge makes it evident that some evaluation by the court of the facts giving rise to the motion is anticipated in most cases. The trial court may, of course, at its option transfer the matter to another judge for decision.[69] Further, it is well within the trial court's discretion as well as desirable in some cases to hold a hearing. The appropriate procedure, then, may depend upon the nature of the allegations made.[70] In this case the motion for recusal, alleging an appearance of bias created by courtroom security measures, was denied without a hearing by the trial judge to whom the case was assigned. Under these circumstances, we believe the proper course on appeal is to accept as true the facts stated with particularity in appellants' verified recusal motion. Viewing the issue in this light, we nonetheless reject appellants' argument for recusal.
 
 
 164
 Appellants recognize that disqualification based on prejudice is required only if the alleged prejudice stems from an extrajudicial source.[71] Because every instance upon which appellants rely to demonstrate the trial judge's bias is either a judicial ruling or some other conduct that occurred during the judge's fulfillment of his judicial duties, we are tempted to reject appellants' argument out of hand. Recognizing the legal requirement of an extrajudicial source, however, appellants have attempted to create an inference of such fact on the basis of courtroom conduct.[72] They submit first that the security precautions taken during the Los Angeles proceedings were related to the Scientologists.[73] Second, they offer the observation that security precautions are usually invoked based upon fear of bodily harm.[74] Appellants then argue that since there is nothing in the record to support the judge's fear of any of the defendants, that fear must be extrajudicial in origin. The final link in this chain of inference is that a deceptive concealment of the reasons for the security evidences prejudice against the defendants. Thus, from an allegedly deceptive statement made concerning courthouse security, defendants draw conclusions both of prejudice and an extrajudicial source of that prejudice. We are unable to accept either conclusion.
 
 
 165
 First, defendants do not persuade us that the source of the judge's fear was extrajudicial. We disagree with defendants that the record contains nothing that might cause the judge to fear for his safety, for the safety of government witnesses, or for the orderliness of the proceedings. The indictment, inter alia, charged the defendants with an unlawful conspiracy to steal government documents by illegal entry into federal offices and by a conspiracy to obstruct justice by subornation of perjury before the grand jury. The Disposition Agreement led to judgments that the defendants were guilty of a conspiracy to obstruct justice with respect to their involvement in the illegal entries. The overt acts alleged as evidence of the conspiracies included handcuffing, gagging, arresting and kidnapping Meisner and imprisoning him under guard when it appeared he was on the brink of surrendering to federal authorities, and harboring a fugitive from justice. These are not placid crimes. Substantial force was used in confining Meisner. In a letter of June 3, 1977, Mary Sue Hubbard told Henning Heldt "to utilize resources to figure out a way to defuse (Meisner) should he turn traitor." Indictment P 14(45) (J.A. 140). The word "defuse" is not defined, but in light of the hostile acts already directed against Meisner, a reasonable interpretation could include severe bodily injury. Indeed, the search of Scientology's Washington headquarters turned up a loaded gun. United States v. Hubbard, 493 F.Supp. 209, 232 n.20 (D.D.C.1979). Under these extreme facts, it was entirely reasonable to take the security precautions that were taken and we refuse to second-guess the district judge and the Marshal's service in their decision to institute security. Consequently, we are unable to agree with defendants that the basis for institution of security must necessarily have been extrajudicial. Indeed, substantial security measures, only slightly less exacting, have been permanently employed for a considerable period of time at the United States Courthouse in Washington, D.C. where Judge Richey regularly hears cases.
 
 
 166
 Further, even if we were to accept all that appellants would have us assume-that the judge misrepresented the facts when he said the security was unrelated to the Scientology case and that the source of the judge's fear could only be extrajudicial-we could not accept appellants' position that this necessarily evidences prejudice against defendants. Scientology's officers and undoubtedly some of its members were highly agitated against the government, as is proved by the widespread organization of the conspiracy and the extreme measures that the conspirators took in an effort to achieve the unlawful objectives. When an organization or its leaders are involved in judicial proceedings, security measures are properly implemented to protect against an overzealous rank and file member of the organization who overreacts to the action taken against his leaders or institution.[75] If the judge had reasonable grounds to fear that appellants or some isolated member of the Church might be carried away by the passion of the moment and take some rash action, he had no obligation to tell them or their counsel that the security was imposed for that reason. Tight security measures, which as stated above are routine in the United States District Courts in the District of Columbia, are, for the most part, irrelevant to the merits of a criminal prosecution, especially in a nonjury suppression hearing. Indeed, the effectiveness of security measures may be diminished if their existence or purpose is disclosed.
 
 
 167
 The question posed, then, is the relevance to the question of prejudice of a judge's concealment of a fact which has no bearing on the merits of the case. An appellate court cannot approve of judicial deceit, but the ultimate issue faced by this court is the probative value of an alleged deception on the issue of prejudice. Even if it occurred, the concealment, as it is here alleged, is not sufficient to raise the appearance of prejudice in the mind of a reasonable person who is familiar with all the facts. From all the circumstances it appears that a reasonable explanation of the judge's statement is that it was an inartful attempt to tell appellants that the security measures were a matter for the court and the Marshal to determine. The court also may have been motivated to protect the defendants from the damaging publicity that might have resulted from a statement by the court as to their numerous illegal acts as disclosed by the court file. In any event, in our judgment appellants have not carried their burden of establishing the appearance of prejudice.
 
 
 168
 Our determination that appellants' argument concerning the judge's remarks regarding security is unavailing obviates any extended discussion of the other incidents claimed to evidence prejudice. The elevator incidents and the hallway incidents suggest little if anything about prejudice. The reliance upon a number of rulings made by the judge is clearly misplaced: not only do the rulings appear unexceptionable, they are incapable of supporting a finding of extrajudicial, personal prejudice.
 
 
 169
 Appellants also suggest that the trial court's failure to assign the case to another judge for sentencing after having heard the proceedings to enforce the Disposition Agreement required recusal under section 455(b)(1), which makes "personal knowledge of disputed evidentiary facts concerning the proceeding" grounds for disqualification. The short answer to this argument is that knowledge gained through the court's judicial role is not "personal" knowledge within the meaning of the statute. United States v. Winston, 613 F.2d 221 (9th Cir. 1980). The conclusion must be the same if the judge's knowledge is said to create an appearance of prejudice under section 455(a). In re Corrugated Container Antitrust Litigation, 614 F.2d 958, 965 (5th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); United States v. Lyon, 588 F.2d 581 (8th Cir. 1978), cert. denied, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 381 (1979); United States v. Cepeda Penes, 577 F.2d 754, 757-58 (1st Cir. 1978); United States v. Wolfson, 558 F.2d 59 (2d Cir. 1977).[76]
 
 
 170
 We are mindful of the counsel given by the Senate Judiciary Committee regarding amended section 455:
 
 
 171
 (I)n assessing the reasonableness of a challenge to (a judge's) impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.
 
 
 172
 S.Rep.No. 93-419, 93d Cong., 1st Sess. 5 (1973) (emphasis in original). The trial judge properly determined that he was under no obligation to recuse himself from this case.
 
 IV. DISQUALIFICATION OF THE PROSECUTORS
 
 173
 Shortly before the suppression hearing defendants moved to disqualify the entire office of the United States Attorney for the District of Columbia from prosecuting this case on the grounds (1) that the office had a disqualifying emotional interest in the outcome of the case since it was the "victim" of one of the crimes alleged in the indictment and (2) that one of the United States Attorneys had been employed by a law firm which represented one of the defendants. The district court, in a memorandum and order filed Sept. 13, 1979, denied defendants' motion. United States v. Hubbard, Cr. No. 78-401 (D.D.C. 1979) (memorandum opinion denying motion to disqualify prosecutors) (J.A. 269). 493 F.Supp. 206.
 
 
 174
 Initially, we are not persuaded by appellants' argument that because the indictment charged some of the defendants with illegally entering the office of a member of the United States Attorney's office all the assistants in the office had a disqualifying interest in this prosecution. Appellants mistakenly contend that the United States Attorney's office was the "victim;" to the extent that a "victim" exists in such a crime, it is the United States of America. As the district court noted in denying defendants' motion, "(i)n this case, none of the Assistant United States Attorneys actually prosecuting the case has been a victim of any of the charges in the indictment. Further, none of the government attorneys has shown any special emotional stake in the outcome of the case." Id. (J.A. at 273). The illegal entry into one of the offices in a large United States Attorney's office would require facts beyond those present here to disqualify all of the lawyers in the office from prosecuting the offenders.
 
 
 175
 Appellants have apparently abandoned their argument that the Assistant United States Attorney's brief employment with one of the law firms that represented a defendant constituted a disqualifying interest. In its place they now contend for the first time that they were denied due process because two prosecutors were defendants in a civil action filed by the Church of Scientology ten days after the search of Scientology's offices in Los Angeles, which suite "alleged that the raids of July 8 were conducted in bad faith, with the intention of violating (Scientology's) constitutional rights." Appellants' Brief II at 17. See Church of Scientology v. Linberg, No. CV-77-2654 (C.D.Cal., filed July 18, 1977) (J.A. 1192).
 
 
 176
 Because of the failure to raise the matter before the district court we hold that the issue is waived on this appeal. Kassman v. American University, 546 F.2d 1029, 1032 (D.C.Cir.1976) (per curiam); Miller v. Avirom, 384 F.2d 319, 321-23 (D.C.Cir.1967). This is not a court of original jurisdiction. We recognize that this principle must give way whenever justice so requires, id., but our analysis of the record does not indicate that this is such a case. We take this opportunity, however, to discuss the due process concerns raised by appellants' motion. We conclude that, whether the supposed interest of the prosecutors in such a situation is characterized as a pecuniary one or as a personal or "emotional" one, the due process argument is without merit on the facts of this case.
 
 
 177
 It is of course improper for a prosecutor to participate in a case when he has a pecuniary interest in the outcome. 18 U.S.C. § 208 (1977). See Sinclair v. Maryland, 278 Md. 243, 363 A.2d 468 (1976); People v. Jimenez, 187 Colo. 97, 528 P.2d 913 (1974); State v. Detroit Motors, 62 N.J.Super. 386, 163 A.2d 227 (1960). The threat posed to a prosecutor's interests in his personal and professional reputation by a bona fide civil action alleging bad faith in the performance of official duties should give rise to a similar concern. See, e.g., State v. Cox, 246 La. 748, 167 So.2d 352, 357 (1964); Oregon State Bar Comm. on Legal Ethics, Opinions, No. 386 (1978). See also 28 C.F.R. § 45.735-13(a) (1980). The conflict in such cases arises because a public prosecutor, as the representative of the sovereign, must "seek justice-to protect the innocent as well as to convict the guilty." Pennsylvania v. Dunlap, 474 Pa. 155, 377 A.2d 975, 976 (1977) (Roberts, J., dissenting from affirmance by an equally divided court). See Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); ABA Code of Professional Responsibility EC 7-13 (1980). Our system of justice accords the prosecutor wide discretion in choosing which cases should be prosecuted and which should not. If the prosecutor's personal interest as the defendant in a civil case will be furthered by a successful criminal prosecution, the criminal defendant may be denied the impartial objective exercise of that discretion to which he is entitled.
 
 
 178
 The government contends that prosecutors cannot be disqualified when sued by a defendant because defendants could then remove whichever prosecutor they please simply by suing him.[77] The defendants contend that this is not so because all acts of a prosecutor taken in his quasi-judicial capacity enjoy the protection of absolute immunity, see Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1975), and that therefore any suit complaining of an action taken in a prosecutor's quasi-judicial capacity would be frivolous and non-disqualifying. In contrast, when a prosecutor actually participates in a search he is engaging in investigative rather than quasi-judicial activity, see Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir. 1980), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981), and therefore loses his absolute immunity from suit if he actually participates in a search,[78] although retaining a qualified, good-faith immunity.[79]
 
 
 179
 This distinction in principle between quasi-judicial and investigative functions persuades us that a criminal defendant cannot routinely remove prosecutors he dislikes, or fears, by suing them. Unless the defendant can complain of some action taken by the prosecutor outside of his quasi-judicial capacity, such suit will generally be barred by absolute immunity. As we held recently:
 
 
 180
 (A)bsolute immunity does not extend to a prosecutor engaged in essentially investigative or administrative functions. Halperin v. Kissinger, 606 F.2d 1192, 1208 (D.C.Cir.1979), aff'd by an equally divided Court per curiam, --- U.S. ---- (101 S.Ct. 3132, 69 L.Ed.2d 367) (1981); Briggs v. Goodwin, 569 F.2d 10, 21 (D.C.Cir.1977), cert. denied, 437 U.S. 904 (98 S.Ct. 3089, 57 L.Ed.2d 1133) (1978); Apton v. Wilson, 506 F.2d 83, 93 (D.C.Cir.1974). However, when a prosecutor is engaged "in initiating a prosecution," his absolute immunity from civil suit is firmly established. Imbler v. Pachtman, ... 424 U.S. at 431 (96 S.Ct. at 995).
 
 
 181
 Dellums v. Powell, 660 F.2d 802, 805 (D.C.Cir.1981) (footnote omitted). The distinction serves the public interest in the administration of criminal justice. Most prosecutors participate in searches to some extent by drafting applications for search warrants and giving legal advice to agents conducting searches, and such practice is certainly encouraged. A loose disqualification rule based on legal advice rendered in an official capacity could disrupt the orderly process of criminal prosecutions without rendering any corresponding benefit to the public.
 
 
 182
 Although we thus recognize in principle the possibility of a disqualifying conflict arising out of a prosecutor's status as a civil defendant, we are nevertheless of the opinion that any conflict of interest that might have existed because two of the assistants here involved were made defendants in an action brought by Scientology based upon participation in an allegedly illegal search and seizure did not amount to a due process violation that would require vacation of appellants' sentences. Given the need to promote the appearance of justice, a trial court on timely motion should disqualify a prosecutor from participating in a criminal action when he has a personal conflicting interest in a civil case.[80] The question we face here, however, is the very different one of what should be done when defendants have failed to move to disqualify on the ground of a conflict of interest,[81] yet assert a denial of due process on appeal. See Magjuka v. Greenberger, 46 A.D.2d 867, 362 N.Y.S.2d 162, 163 (1974). We must reconcile the governmental interests in conserving judicial and prosecutorial resources[82] and in preserving the appearance of impartiality with the interest of the defendant in receiving fair and evenhanded treatment from his accusers. We believe the best resolution is to require in such circumstances that the defendants prove actual prejudice. Cf. United States v. Birdman, 602 F.2d 547, 559-60 (3d Cir. 1979) (actual prejudice standard applied where prosecutor testified before grand jury), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). With regard to an appearance of conflict on the part of the prosecution, on appeal a defendant has cause to complain only if he was prejudiced. See People v. Poplis, 30 N.Y.2d 85, 281 N.E.2d 167, 330 N.Y.S.2d 365 (1972). To the extent he might receive relief from a prosecution solely on a showing of potential prejudice, he would be the undeserving beneficiary of a rule that attempts to promote the public good. In our judgment the strong governmental interest in expedient proceedings justifies a rule that gives the defendants on the facts of this case relief only if they can demonstrate prejudice; otherwise, the convictions will stand.[83]
 
 
 183
 Appellants have made no credible claim of actual prejudice based on the prosecutors' alleged pecuniary or personal interest in the outcome of this prosecution. In arguing that the pending civil suit produced a prejudicial conflict of interest in the prosecution, they argue primarily that "dismissal of the civil suit against Messrs. Banoun and Schuelke (was made) a bargaining chip in the disposition negotiations.... The government even sought to withdraw from an agreement it had reached with the defense on September 23, 1979 that did not include dismissal of the civil suit against Mr. Banoun and substitute for it an agreement that provided for such dismissal." Appellants' Brief II at 55-56. Appellants claim that this conduct evinces an effort by the prosecutors to manipulate the criminal case to their advantage in the civil matter. We note in passing that these same facts would equally well support the conclusion that defendants, by initiating a highly questionable lawsuit, were attempting to create for themselves a bargaining chip in order to obtain more favorable disposition of the criminal charges in the indictment. In any event, the argument need not detain this court long. First, the trial court enforced the agreement reached on September 23, 1979, which did not contain any provision that required Scientology to dismiss its claim against the prosecutors and other government personnel. Second, the Acting United States Attorney did not raise the issue of the civil suits until after September 23rd, the date upon which the court found the parties had agreed to the disposition it enforced. Relief from the civil actions was proposed only on September 26, as defense counsel apparently conceded shortly thereafter. See Transcript of Settlement Conference, Oct. 2, 1979, at 52. Finally, it appears, as the government suggests, that lead defense counsel had previously expressed a desire for a complete disposition:
 
 
 184
 "Mr. Hirschkop: ... If I could wrap it up once and for all, and not have to go through repeated prosecutions, that is one thing ...."
 
 
 185
 (Tr. 9/23/79 at 24-25) (emphasis added) (J.A. 474). See Govt. Br. at 144 n.168. We find, in short, absolutely no support for the claim that the criminal charges were either brought or prosecuted in a particular fashion in order to influence defendants to dismiss their civil suit. The government had previously acquired, as the affidavit for the search warrant fully supports, very substantial evidence of monstrous criminal offenses which no responsible United States Attorney could refuse to prosecute. The search warrants were requested to obtain corroborative evidence of crimes that were fully articulated in the supporting affidavit.
 
 
 186
 We accordingly affirm the district court's refusal to disqualify all prosecutors in the office of the United States Attorney for the District of Columbia, and reject defendants' new argument that the participation in this prosecution of prosecutors sued by Scientology for their official role in the Los Angeles searches resulted in a denial of due process. Our disposition of the search and seizure issue, supra, also disposes of the claim that the government or the prosecutors participated in an illegal search.
 
 
 187
 V. THE ALLEGED VIOLATION BY THE GOVERNMENT OF THE AGREEMENT
 
 FOR THE DISPOSITION OF HUBBARD'S CASE
 
 188
 After long negotiations the government submitted to the defendants a proposed agreement for the disposition of the case. Under the agreement the defendants would be found guilty by the District Court on a stipulated record. Specifically, defendant Hubbard was to be found guilty on Count Twenty-three of the indictment. Paragraph 5 of the Agreement provided:
 
 
 189
 5. The government retains the right to allocute on matters in any fashion it chooses as to all defendants except the defendant Hubbard. As to the defendant Hubbard, the government agrees to advise the Court as follows: "the government takes no position and is making no request on the matter of sentence with respect to the defendant Hubbard." It is understood that Mrs. Hubbard through her counsel will make no statement in allocution concerning the facts of the case. It is further agreed that as to any defendant, including Mrs. Hubbard, the government may dispute any statements of fact on any matter with which it has disagreement....
 
 
 190
 September 23, 1979 at 5 P.M. was set as the deadline for acceptance of the agreement by the defendants. Subsequently, the government contended that the defendants had failed to accept, so the agreement did not become effective. The defendants filed a motion for an order enforcing the agreement, and requested an evidentiary hearing on the matter. The court conducted such a hearing and on October 8, 1979 granted the defendants' motion. On October 16, 1979 the government filed a motion for reconsideration of the court's order directing enforcement. The government's motion was denied.
 
 
 191
 Invoking Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), Hubbard now contends that by a statement in its motion for reconsideration the government violated paragraph 5 of the disposition agreement, by taking the position "that Mrs. Hubbard should receive a jail sentence, especially since she was at the head of the conspiracy." Analysis of Hubbard's complaint requires consideration of the context in which the government's statement was made.
 
 
 192
 At the hearing on the motion to enforce the disposition agreement Hubbard's counsel, Mr. Boudin, testified that the government's position was that Hubbard should not receive a jail sentence. Thus Mr. Boudin testified:
 
 
 193
 Q Well, you did urge the court to continue the case on Friday, the 21st?
 
 
 194
 A I think I have consistently urged the court to continue this case in the hope that we would achieve the result of an agreement, or to enforce an agreement which I thought we had reached.
 
 
 195
 A As far as I was concerned, I, personally had only one objective: to carry out what I thought was the government's position that it did not want Mrs. Hubbard to go to jail.
 
 
 196
 Q Now, Mr. Boudin-
 
 
 197
 A And that is all I had personally in mind. I was not concerned about the criminal prosecution of Mrs. Hubbard elsewhere.
 
 
 198
 I was not really concerned about testimonial immunity, or the problem.
 
 
 199
 My real concern was only one thing: to make it clear to the court that the government did not want Mrs. Hubbard to go to jail.
 
 
 200
 Q Mr. Boudin, wasn't it, in fact, the government's position that Mrs. Hubbard should go to jail, but that that would be left up to the court?
 
 
 201
 A Absolutely not. Absolutely not. The government told me in Los Angeles that it did not expect that the court would put Mrs. Hubbard in jail. That was an unequivocal statement made-
 
 
 202
 Q You are saying-
 
 
 203
 A (Continuing)-by Mr. Banoun and by Mr. Reardon.
 
 
 204
 And the government repeated in the meetings of the week of September 17th that it did not want to say explicitly that it did not want Mrs. Hubbard to go to jail, because that would be contrary to a policy position.
 
 
 205
 But that it did not expect the court to put Mrs. Hubbard in jail.
 
 
 206
 Q Mr. Boudin, that is quite different from saying that the government stated it did not want Mrs. Hubbard to go to jail, isn't it?
 
 
 207
 A No, I think the government stated that it did not want Mrs. Hubbard to go to jail, because it recognized in Los Angeles and here one thing that was indisputable, and that I told his honor in the presence of Mr. Banoun at the bench: Namely, Mrs. Hubbard's ill health.
 
 
 208
 (Tr. 10/5/79 at 121-24) Counsel for Heldt and Snider, Mr. Hirschkop, also sounded this theme:
 
 
 209
 The government kept making it clear that they did not care to have Mrs. Hubbard incarcerated, but they did not want to make that known to the court.
 
 
 210
 The prosecution agreed they were not anxious to see Mrs. Hubbard go to jail. That was not their position. They just didn't want to say that to the court publicly.
 
 
 211
 (Tr. 10/2/79 at 13, 20)
 
 
 212
 In his testimony at the hearing Assistant United States Attorney Banoun denied that the prosecutors had said they did not want Mrs. Hubbard to go to jail:
 
 
 213
 We indicated that we would, that our office would under no circumstance enter into any agreement which bound any court to a pre-plea agreement, that there would be no incarceration, that our office just didn't do it and we didn't believe any of the judges in this court did.
 
 
 214
 Q Mr. Banoun, did you at any time tell Mr. Boudin that you were opposed to or did not want his client, Ms. Hubbard, to go to jail?
 
 
 215
 A Absolutely not.
 
 
 216
 Q Did you-
 
 
 217
 A To the contrary, I would say.
 
 
 218
 Q Excuse me?
 
 
 219
 A I would say that I never said that, that I told him when we were negotiating in LA it was quite possible she may not go to jail; on the other hand, it's quite possible she may.
 
 
 220
 We did not-I said we could not bind the judge in any way. It was totally up to the judge, but that we would not stand up and take a position of no jail because that would not be consistent with our theory of the case or the United States' position or the best interests of justice.
 
 
 221
 Q Did you at any time tell Mr. Boudin that you didn't expect the Court to send his client to jail?
 
 
 222
 A Absolutely not.
 
 
 223
 (Tr. 10/5/79 at 210p, 210q)
 
 
 224
 At the instance of the defendants the District Court ruled that because United States Attorney Rauh had cross examined a witness at the hearing, he would not testify concerning the government's position.
 
 
 225
 In proposed findings of fact on the motion to enforce the disposition agreement, filed on September 30, 1979, the defendants stated that during the negotiations on the agreement
 
 
 226
 Defense counsel argued strenuously for inclusion of a statement that "the government does not seek Mrs. Hubbard's incarceration." Defense counsel pointed out that from the beginning the other defendants had expressed the willingness to sacrifice their own personal interests in return for favorable consideration for Mrs. Hubbard, and that the government's own formulation indicated a conclusion that the interests of justice did not demand the incarceration of Mrs. Hubbard. The government lawyers said that for "policy" reasons only, they were unwilling affirmatively to state the latter proposition on the record, although several of the prosecutors did feel that the interests of justice did not require Mrs. Hubbard's incarceration.
 
 
 227
 J.A. at 998.
 
 
 228
 In its motion of October 15, 1979 for reconsideration of the order enforcing the agreement the government stated:
 
 
 229
 The defense has maintained in its motion and during the hearing that the government felt that the interests of justice did not require Mrs. Hubbard's incarceration. This is not so. Mr. Rauh would have testified that he believed that Mrs. Hubbard should receive a jail sentence, especially since she was at the head of the conspiracy. The government agreed not to allocute as to Mrs. Hubbard because this issue was holding up a possible disposition and because the government believed that the Court would recognize that Mrs. Hubbard was at the top of the conspiracy and impose the appropriate jail sentence.
 
 
 230
 J.A. at 507 (footnotes omitted). Hubbard views this statement as an improper and prejudicial attempt by the government to evade its promise to make no request with respect to a sentence in her case.
 
 
 231
 Considering the government's statement in context we think it is not susceptible of the interpretation placed upon it by Hubbard. The statement was a direct response to the testimony of Hubbard's counsel that the government "did not want Mrs. Hubbard to go to jail." That statement constituted an anticipatory allocution on behalf of Hubbard. Believing as it did that the statement was a misrepresentation of its position the government was under a duty to dispute it. In so doing the government properly availed itself of the proviso in the settlement agreement "that as to any defendant, including Mrs. Hubbard, the government may dispute any statements of fact on any matter with which it has disagreement." Had the government failed to challenge defense counsel's representation the court in passing sentence would have acted on a factual premise that in the government's view was false; and no disposition agreement could require the government to permit that to happen.
 
 
 232
 The government did not violate the disposition agreement.
 
 
 233
 VI. THE REFUSAL TO GRANT TESTIMONIAL IMMUNITY TO KEMBER
 
 
 234
 A. Hubbard's Motion for "Use" Immunity for Kember
 
 
 235
 Mary Sue Hubbard, second only to her husband L. Ron Hubbard in the hierarchy of the world-wide Church of Scientology, was the first-named and principal defendant in the conspiracy count and associated offenses charged in the indictment. She held the title of "Controller" and Commodore Staff Guardian (CSG), and had duties under her husband which included supervision of the Guardian Offices. J.A. at 927. Shortly before the scheduled trial date, she moved the court, after the government denied a similar request, for an order pursuant to 18 U.S.C. § 6002 (1970)[84] granting testimonial ("use") immunity to Jane Kember so that Kember could offer allegedly "exculpatory" testimony in behalf of Mrs. Hubbard.
 
 
 236
 Jane Kember, the second-named defendant in the indictment, which describes her as having "the title of 'Guardian World-Wide' (GWW) and head(ing) the daily operation of all Guardian's Offices, reporting directly to L. Ron Hubbard and Mary Sue Hubbard." Indictment P 5 (J.A. 109). She succeeded Mrs. Hubbard as the person responsible for the day-to-day activities and supervision of the Guardian Office. Affidavit of Stephen M. Bird at 11 (J.A. 927). Kember is one of the principal defendants in the case. At the time of Hubbard's motion Kember was a fugitive in England, where she conducted Scientology operations, and was fighting extradition to this country. Hubbard's motion sought more than mere use immunity for Kember. It requested in addition that the government permit Mrs. Kember to travel to the United States to testify in aid of Mrs. Hubbard and then allow her to return to England to continue her legal challenge to the extradition efforts of the United States.
 
 
 237
 Neither Hubbard nor Kember filed personal affidavits as is normally required. Instead Hubbard's local lawyer (Boudin) and Kember's British solicitor (Bird) filed what are essentially hearsay affidavits. The solicitor's affidavit is based on "instructions I have received from Mrs. Kember," and relying thereon states that she would testify to certain facts in support of Hubbard that allegedly would be beneficial to Hubbard's case. Because of the disposition we make of this motion we will not deal with the procedural defects of such affidavits, but will analyze their evidentiary allegations as though the facts had been properly presented.
 
 B. "Use" Immunity in the Courts
 
 238
 The first, and most decisive reason for affirming the refusal of the government and the court to grant Hubbard's motion for "use" immunity for Kember lies in the decisional law interpreting 18 U.S.C. §§ 6002 and 6003.
 
 
 239
 Recent cases interpret the relevant statute as not obligating the government to grant use immunity to a putative defense witness who is a principal co-defendant of the defendant who seeks the immunized testimony. While upholding the validity of the "use" immunity statute, the Supreme Court, by Justice Powell, pointed out:
 
 
 240
 "Once a defendant demonstrates that he has testified under a ... grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."
 
 
 241
 Kastigar v. United States, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972), quoting Murphy v. Waterfront Commission, 378 U.S. 52, 79 n.18, 84 S.Ct. 1594, 1609 n.18, 12 L.Ed.2d 678 (1964). Granting "use" immunity thus increases the potential burden of proof the government must bear. If defendants could obtain testimonial immunity for other defendants to testify, it would inevitably snarl criminal proceedings. The imagination of defense counsel could run riot and, with the government being unable to control the extent of the witness' testimony, immunity and claims of immunity for the codefendant witness would be sprouting with every answer.
 
 
 242
 The recognized rule is that the statute does not obligate the government to grant "use" immunity to defendants' witnesses and the power to apply to the court for use immunity is confined to the government. Grochulski v. Henderson, 637 F.2d 50 (2d Cir. 1980), cert. denied, 450 U.S. 927, 101 S.Ct. 1383, 67 L.Ed.2d 358 (1981); United States v. Turkish, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); United States v. Lenz, 616 F.2d 960, 962-63 (6th Cir.), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); United States v. Klauber, 611 F.2d 512 (4th Cir. 1979), cert. denied, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); United States v. Bacheler, 611 F.2d 443 (3d Cir. 1979); United States v. Herman, 589 F.2d 1191 (3d Cir. 1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); United States v. Graham, 548 F.2d 1302, 1314 (8th Cir. 1977); In re Kilgo, 484 F.2d 1215, 1222 (4th Cir. 1973).
 
 
 243
 Generally, a trial court has no authority, in the absence of a request by the government, to provide use immunity for a defense witness. United States v. Herbst, 641 F.2d 1161, 1168 (5th Cir. 1981); United States v. Lenz, 616 F.2d 960 (6th Cir.), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); United States v. Gleason, 616 F.2d 2, 27-28 (2d Cir. 1979), cert. denied, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); United States v. Niederberger, 580 F.2d 63 (3d Cir.), cert. denied, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); United States v. Morrison, 535 F.2d 223 (3d Cir. 1976); United States v. Berrigan, 482 F.2d 171 (3d Cir. 1973). Contra, United States v. DePalma, 476 F.Supp. 775 (S.D.N.Y. 1979). Where the defense has been denied material testimony by prosecutorial misconduct, however, two courts have held that the trial court, in order to correct such misconduct, may order the government on remand to grant use immunity or suffer the dismissal of its case. United States v. Herman, 589 F.2d 1191 (3d Cir. 1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); United States v. Morrison, 535 F.2d 223 (3d Cir. 1976); cf. Government of the Virgin Islands v. Smith, 615 F.2d 964 (3d Cir. 1980) (distinguishing statutory and "judicial" immunity); see also Earl v. United States, 361 F.2d 531, 534 n.1 (D.C.Cir.1966), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). This is not such a case.
 
 
 244
 An extensive discussion of the cases is not necessary. The Second Circuit's decision in United States v. Turkish, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), discusses the alternatives. The defendants there moved that seventeen of the prospective defense witnesses be granted immunity and be required to testify under 18 U.S.C. § 6001. The customary argument was made by the movants that "these witnesses could provide exculpatory testimony, but would invoke their Fifth Amendment privilege and decline to testify unless compelled to do so." At the trial court's invitation the government considered the request, but decided not to grant immunity, and the validity of this decision was upheld by the trial court after the trial. Affirming that decision, the Second Circuit commented:
 
 
 245
 (W)e think trial judges should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution.[85] No hearing should be held to establish such status. The prosecutor need only show that the witness has been indicted or present to the court in camera an ex parte affidavit setting forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity.
 
 
 246
 623 F.2d at 778 (emphasis added). The court deferred passing on factual situations where the witness is not an indicted defendant or a potential defendant or where the government prefers not to state its position. In a separate opinion, Judge Lumbard stated:
 
 
 247
 In my view it is not the proper business of the trial judge to inquire into the propriety of the prosecution's refusal to grant use immunity to a prospective witness.
 
 
 248
 Id. at 779 (Lumbard, J., concurring in part and dissenting in part). This seems to be the soundest interpretation of the statute. We accordingly affirm the trial court's denial as a proper interpretation of the statute.
 
 
 249
 C. The Affidavits Filed in Support of the Motion
 
 
 250
 Even if the foregoing analysis did not persuade us that the court correctly denied Hubbard's motion, we would in any event deny the motion based on the factual insufficiency of the filed affidavits. The affidavits allege that if Kember were called as a witness for Hubbard she would claim that her testimony would incriminate her and would refuse to testify unless she were assured that her testimony could not later be used against her. Bird's affidavit for Kember further states "her testimony potentially might be highly incriminating to herself." J.A. at 911. Several of the significant allegations of the Bird affidavit assert that practically all the incriminating documents in the case came to Kember's knowledge and that Kember's potential testimony was "exculpatory" of Hubbard; and the affidavit is replete with assertions "that Mrs. Hubbard had no prior knowledge " of certain allegedly unlawful activities described in the indictment. J.A. at 935-38, 942. Hubbard's brief also asserts that "Mrs. Kember was the only witness who could have given detailed and creditable testimony on ... (certain) stated matters." Hubbard's Brief at 70 (emphasis added). The Boudin affidavit also describes defendant Kember as the "principal, and perhaps the only witness who can testify to certain points." J.A. at 911 (emphasis added). Hubbard's brief also states Kember would allegedly testify that Hubbard "had no knowledge of or responsibility for the allegedly criminal acts described in the documents which the government intended to introduce as evidence." Hubbard's Brief at p. 72.
 
 
 251
 The Boudin affidavit in support of Hubbard's motion purported to analyze the government's case and concludes that the Kember testimony would be "exculpatory." The affidavit further alleges that "Kember would (testify) that because of the extensive activities and interests of the Guardian Office, Mary Sue Hubbard could not possibly have known about, and would be prevented from knowing about, the vast majority of such (incriminating) matters." J.A. at 910. The "Red Box" program suggests otherwise.
 
 
 252
 Many of the claims in the Boudin (Hubbard) affidavit with respect to Kember's potential testimony are less than conclusive and hedge their probative effect by limiting terminology. For example: "Mrs. Hubbard has had little responsibility for the director (sic) or supervision of the Guardian Office ..." "(W)ritten programs, instructions, and compliance reports ... of the Guardian Office ... usually were not authorized or seen by Mrs. Hubbard ..." "As to "... communications addressed to Mrs. Hubbard ... Mrs. Kember did not pass along most of them. " "Mrs. Hubbard ... would (never) ... have received copies of the overwhelming majority of the (incriminating) documents referred to in the indictment. Hubbard Brief, p. 69-70 (emphasis added). The qualified nature of such representations fails to offer sufficient support for the representation that Kember's testimony would be "exculpatory" of Hubbard's criminality.
 
 
 253
 The factual claims of Hubbard's lawyer and Kember's solicitor asserted in their affidavits in support of Hubbard's motion to grant use immunity to Kember can be summarized as follows:
 
 
 254
 (1) Kember would testify that Hubbard had "no prior knowledge" of certain of the unlawful activities-she "had no knowledge of or responsibility for the alleged criminal acts." Hubbard Brief at 72.
 
 
 255
 (2) Kember was the only witness in a position to offer such essential testimony. J.A. at 911.
 
 
 256
 (3) Kember would offer "essential exculpatory testimony." J.A. at 908.
 
 
 257
 As to (1) the affidavits indicate that much of the alleged beneficial testimony of Kember would not be admissible for various reasons. And even if some of the testimony was admitted, while it might give some aid to Hubbard's case, it would fall short of being substantially exculpatory. Obviously Kember was close to Hubbard in some operations and at some times, but there were huge gaps of time when they were hundreds of miles apart. Kember might be able to testify as to some documents she forwarded to Hubbard and some that she did not, but she was not a competent witness to Hubbard's complete lack of knowledge on many matters during very substantial periods covered by the indictment. The affidavits exaggerate the probative effect of the admissible evidence. In a similar case, Chief Judge Winner pointed out with respect to an allegation that a witness will testify "to what (a) defendant knew" is "not infrequently ruled (to be inadmissible because) a witness can't testify to the fact of another's state of mind, barring a possible exception where the witness is a psychiatrist." United States v. McMichael, 492 F.Supp. 205, 208 (D.Colo.1980).
 
 
 258
 Another fatal weakness in the affidavits of counsel lies in the fact they do not support the allegation that Kember was the only witness who could allegedly testify to Hubbard's lack of knowledge. The availability of other witnesses would be one factor that could be relied on to deny a request for immunity. Some of the flaws in Kember's claim as to the probative effect of her testimony have been pointed out. In addition, if such facts did exist, better witnesses would be Scientology's employees described in the affidavits who were physically closer to Mrs. Hubbard at various times and who screened her correspondence-for example, "her personal assistant Nikki Merwin," J.A. at 929, or any one of "three assistants," J.A. at 930, or later the "two assistants" and Mrs. Hubbard's "personal communicator," J.A. at 931. These assistants at various times presented brief summaries to Mrs. Hubbard of her correspondence and Mrs. Hubbard allegedly relied upon her assistants, though even their testimony would not be complete as to her activities because "for certain periods (Mrs. Hubbard) was in different locations from her two executive assistants." J.A. at 932. The testimony of such assistants, and even of Kember's clerical assistants, would be necessary to completely cover the claim. In fact, Kember's clerical assistants who typed the letters and mailed or filed the correspondence seemingly could testify to what documents were forwarded to Hubbard. The testimony of these assistants would also carry greater credibility than the testimony of Kember because they were not serving in policy positions with Scientology and had not been indicted. But even their testimony would not be conclusive on the issue of Hubbard's knowledge.
 
 
 259
 The factual allegations in the affidavits with respect to Kember's ability to offer exculpatory testimony for Hubbard also do not indicate that they are generally directed to the time period covered by Count 23 to which Hubbard entered a guilty plea and is the only conviction before us. The time period of this count ran from June 11, 1976 to July 8, 1977. Most of the Kember (Bird) affidavit, to the extent that it is specific, is devoted to earlier periods. Kember's representations with respect to Count 23 allege:
 
 
 260
 54. Concerning Count 23, that Mrs. Hubbard never met Gerald Bennett Wolfe prior to the issuance of this indictment, and has not met Michael Meisner to this day; that she Mrs. Hubbard had no prior knowledge, and certainly did not agree or authorize their entry into the United States Courthouse or any other government office for the purpose of burglarizing and stealing documents; that Mrs. Hubbard was not aware of the existence of Grand Jury proceedings conducting the investigation referred to in Count 23, paragraph 3, and that consequently she entered into no agreement to violate section 18 USC 1503; and that she, Mrs. Kember, would not be suggesting in any way that Mrs. Hubbard engaged in an agreement to commit the other offenses set forth in para 8, Count 23.
 
 
 261
 J.A. at 943. Several of these allegations are highly selective, and they do not negate other facts that might prove Hubbard's guilt on the conspiracy count. That Hubbard never met Wolfe before the indictment and has never met Meisner does not disprove her participation in the conspiracy. It is not necessary that all conspirators meet each other. United States v. Hernandez, 608 F.2d 741 (9th Cir. 1979); United States v. Avalos, 541 F.2d 1100 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977). And, to the extent that the quoted allegations might be construed as attempting completely to negate Hubbard's guilt thereon, they are highly conclusory and incomplete, in that they do not deny other facts that would incriminate her in the offenses.[86]
 
 
 262
 It is therefore too plain from the affidavits for further discussion that there were many people who actually handled Mrs. Hubbard's correspondence and could testify with respect to it. Some of them were far better qualified for certain periods to so testify than Kember because they actually handled the correspondence at Hubbard's elbow when Kember was miles away. They might also be able to testify to any documents that incriminated Hubbard and were destroyed pursuant to the "Red Box" program. And Kember could not testify as to knowledge Hubbard may have gained from other sources. It is thus clear that Kember was not the only witness who might testify to substantially the same facts, and that no witness could testify to the state of Hubbard's mind or as to the extent of her own knowledge except herself. The Guardian's Office was alleged to have "more than 1050 full-time staff." J.A. at 923. With such a plethora of potential witnesses it cannot be concluded that Kember is the only witness. The admissibility of the critical parts of Kember's testimony was thus highly questionable and there were other witnesses who were better qualified to testify to the basic facts from which such knowledge would be deduced or denied.
 
 D. The Effect of the Disposition Agreement
 
 263
 A further consideration at this time is the fact that Hubbard and the other defendants were found by the court, on the pleading of the defendants, to have entered into a Disposition Agreement (see Appendix) which called for the court to decide the case on a "Stipulation of Evidence." J.A. at 348-61. The agreed "Disposition" essentially amounts to an admission of guilt on the "stipulated record" to one count of the indictment and limits the challenges the defendants might assert to any conviction. As set forth above, the Disposition Agreement between the parties provided, inter alia, that the defendants agreed "not to challenge the sufficiency of the evidence ... on appeal (and to refrain from) assert(ing) that the facts alleged do not amount to a violation of the crime charged because of other considerations. " J.A. at 356-58. (emphasis ______) Hubbard's present attempt on appeal to remand the case to secure the immunized factual testimony of Kember, or to have the case dismissed for failure to secure such factual testimony, constitutes an attempt to introduce additional evidence in violation of this agreement. Her motion in this respect therefore would be denied on such grounds if we had not already found that it did not lie under sections 6002 and 6003, and that the factual support for it was insufficient. It is also significant that Hubbard did agree on the facts in the stipulated record to "be found guilty on Count twenty-three of the indictment" charging conspiracy to obstruct justice in violation of 18 U.S.C. § 1503 and several other offenses.[87]
 
 
 264
 We therefore affirm the action of the government in refusing to grant "use" immunity to Kember and the court's refusal to order such immunity. Apart from the fact that "use" immunity was not required to be granted, it would have been foolhardy to grant such immunity as it would have increased the government's burden of proof against a defendant who it appeared from the record was the highest official of Scientology with admitted guilty knowledge of the indicted crimes. The Attorney General must approve the grant, and the United States Attorney must be satisfied that the testimony is necessary to the public interest.[88] It would obviously not have been in the public interest to hazard the prosecution of Kember with all the potential objections that might evolve from granting "use" immunity to her.
 
 APPENDIX
 DISPOSITION AGREEMENT
 
 265
 The Court finds that the government and the defendants in this case agreed to the following:1. Defendants Hubbard, Heldt, Snider, Weigand, Willardson, Raymond, and Wolfe will be found guilty upon Count Twenty-three of the indictment, which charges the defendants with conspiracy to obstruct justice, by the trial court upon a stipulated record;
 
 
 266
 2. Defe(n)dant Hermann will be found guilty upon Count One of the indictment, which charges the defendants with conspiracy to illegally obtain government documents, by the trial court on a stipulated record;
 
 
 267
 3. Defendant Thomas will be found guilty upon any misdemeanor theft count contained in the indictment by the trial court upon a stipulated record with the specific count chosen by the government;
 
 
 268
 4. The remaining counts in the indictment shall not be dismissed pending disposition of any appeals brought by the defendants. In the event that a conviction of a particular defendant is reversed or vacated as a result of judicial review, the government retains the option of proceeding on any of the remaining counts as to that defendant. In the event that the conviction of any defendant is not reversed, all remaining counts as to that defendant shall be dismissed with prejudice upon entry of the final judgment of conviction. 4 (* It is understood that the appellate process may include proceedings on certiorari in the United States Supreme Court;
 
 
 269
 5. The government retains the right to allocute on matters in any fashion it chooses as to all defendants except the defendant Hubbard. As to the defendant Hubbard, the government agrees to advise the Court as follows: "the government takes no position and is making no request on the matter of sentence with respect to the defendant Hubbard." It is understood that Mrs. Hubbard through her counsel will make no statement in allocution concerning the facts of the case. It is further agreed that as to any defendant, including Mrs. Hubbard, the government may dispute any statements of fact on any matter with which it has disagreement;
 
 
 270
 6. In the event that any defendant receives a term of incarceration as a result of conviction in this case, the government will not object to his or her incarceration in a minimum security institution currently designated level one by the Bureau of Prisons.
 
 
 271
 7. Should the Bureau of Prisons or the Parole Commission request of the government its view as to the category of the severity of the offense of which the defendants have been convicted, the government will not tell these agencies that the offenses involved more than $2,000 in property value;
 
 
 272
 8. The government reserves the right to attach any or all of its designated case-in-chief documents to the stipulated record to support findings of guilt by the trial court. The defendants have agreed not to challenge the sufficiency of the evidence before the trial court or on appeal. That is, the defendants will not challenge the accuracy of the facts stipulated by the government, and the defendants will not assert that the facts alleged do not amount to a violation of the crime charged because of other considerations. The government shall oppose any attempt of the defendants to have the stipulated record sealed. With respect to all documents seized during the searches in California on July 8, 1977, the government retains the right to distribute copies of such documents to state and federal law enforcement agencies and other agencies of the federal government. It is further agreed that these documents will not be made available by the government to the press or to any private individuals or entities except pursuant to lawful subpoena and following ten days' notice to the Church of Scientology;
 
 
 273
 10. The stipulated record upon which the defendants are to be convicted will be prepared by the government and submitted to the defense two days after the day upon which the agreement is finalized. The defense will be given twenty-four hours to comment on and propose additions to the stipulated record. The government may accept or reject the defendants' proposed changes;
 
 
 274
 11. The government has made no promises with respect to immunity from prosecution in other jurisdictions.
 
 
 275
 (J.A. 356-358).
 
 
 276
 WALD, Circuit Judge (concurring in part, and concurring in the result):
 
 
 277
 I concur in the result in this case, but I cannot agree with all the rhetoric in sections I and III-VI of the court's opinion. Regarding section II, which treats the search and seizure issue, I concur in the opinion, except for the court's discussion of the search of Mrs. Lawrence's office at Fifield Manor,[1] and the degree of preparation required of agents conducting complex document searches.[2] I would also clarify the application of the "scrupulous exactitude" test in this case.[3] I confine my remarks to the latter three issues.
 
 
 278
 The court properly states the law that "the authority to search granted by any warrant is limited to the specific places described in it, and does not extend to additional or different places."[4] I find, however, that Mrs. Lawrence's office was nowhere mentioned in the warrant and the searching officers could not reasonably have believed that her office constituted part of the "suite of offices of Mr. Henning Heldt(.)" J.A. at 155 (warrant's description of the place to be searched). I find appellants' arguments on this issue[5] persuasive: the Lawrence office was a separate, free standing structure, independently locked, with no external markings of any sort to indicate that it constituted part of someone else's office in the main building. It is highly significant that access to the Heldt suite of offices in the main building would not provide access to the Lawrence structure.[6] In addition, the only indication whether this structure-nowhere referred to in the warrant-was or was not part of the Heldt suite came from Mrs. Lawrence, who said it was her own office, not Mr. Heldt's, and that she did not work for him.[7] Of course, as the court says, Mrs. Lawrence "should (not) have been permitted to lay down the boundaries for the agents' search."[8] But her remarks are worthy of attention not only because they represent the only specific statement which the agents had before them to judge whether the structure was or was not part of the Heldt suite, but also because they corroborated the physical evidence indicating the separateness of the structure from the Heldt suite. For these reasons, I am convinced that entry into Mrs. Lawrence's office was outside the scope of the warrant and unlawful. I am in accord with the per curiam opinion, however, insofar as it concludes that even if this search of the Heldt suite were outside the warrant, the circumstances under which it was conducted do not represent such flagrant disregard for the warrant as to convert the search into a general one requiring total suppression of all documents seized.[9]
 
 
 279
 In its discussion of the preparation required of agents who undertake searches for documents, the court states that "the agents should be familiar with the general nature of the crimes that are charged and the list of items they are authorized to seize, either through reading of the warrant or through adequate instructions or supervision from those in charge."[10] I certainly agree that it is improper for a search of this magnitude to be undertaken unless those participating in it familiarize themselves with the list of particulars they are authorized to seize. But I am convinced that a first-hand reading of the list, or a thorough oral communication of it, constitutes the minimum preparation each agent must receive before conducting a document search of this kind. I cannot envision what sort of "supervision" the court speaks of which would suffice to familiarize agents with a list of particulars they have neither been told about nor read. I do agree, however, that "the arrival of a supplementary contingent of inadequately prepared agents in this particular case (did not result) in a general search which might require the exclusion of all seized documents."[11]
 
 
 280
 Finally, although I concur with the court's discussion of the "scrupulous exactitude" test as far as it goes,[12] I would add that the need for minimization in conducting document searches[13] is intensified where the documents are sought because of "the ideas which they contain." If the particularity requirement is not obeyed with "the most scrupulous exactitude" in such cases, "the protection of (first amendment) freedoms (might be left) to the whim of the officers charged with executing the warrant(.)" Stanford v. Texas, 379 U.S. 476, 478, 485, 85 S.Ct. 506, 508, 511, 13 L.Ed.2d 431 (1965); see Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 1980, 56 L.Ed.2d 525 (1978). In this case it is true that most of the documents listed in the warrant were allegedly stolen; thus their content was irrelevant to the justification for their seizure. It is equally clear, however, that at least with respect to items 152-62 in the warrant, the "ideas" contained in the documents were, or may have been, the basis for their seizure, since those documents were subject to seizure only because they evinced some intent to commit conspiracies against the government, just as some documents in Stanford were subject to seizure only because they evinced some intent to violate the Texas Suppression Act. In both cases agents were sent to seize, inter alia, any documents which contained certain generally described thoughts or plans, rather than being sent to seize only specific items, e.g., a stolen television, or heroin, or a particularly described diagram, ledger, or letter. See Stanford v. Texas, 379 U.S. at 485 n.16, 85 S.Ct. at 511 n.16. The former directives lack the inherent exactitude present in the latter, and inevitably require non-neutral officers to make important discretionary judgments as to the nature and content of various documents. Equally significant is the fact that here, as in Stanford, the group subjected to the search was a political or religious organization currently in conflict with the government, precisely the type of group that the first and fourth amendments most vigilantly protect. See generally Zurcher v. Stanford Daily, supra, 436 U.S. at 564, 98 S.Ct. at 1980; NAACP v. Alabama, 357 U.S. 449, 460-62, 78 S.Ct. 1163, 1170-71, 2 L.Ed.2d 1488 (1958). Thus, had defendants alleged that certain documents admitted as evidence against them had been unlawfully seized, the scrupulous exactitude standard might have been appropriately applied. But that is not the argument here,[14] and I agree with the court that the scrupulous exactitude standard is not appropriate for deciding whether a general search occurred requiring total suppression of everything seized.
 
 
 281
 Subject to the above, I concur in the opinion of the court concerning the search and seizure issue, and with the results reached in other sections of the opinion.
 
 
 
 [1]
 The appellants are Henning Heldt, Duke Snider, Mary Sue Hubbard, Sharon Thomas, Gregory Willardson, Richard Weigand, Cindy Raymond, Gerald Bennett Wolfe and Mitchell Hermann. Two other defendants, Jane Kember and Morris Budlong, were in England, fighting extradition, when this case was tried. They were subsequently extradited on the burglary counts, and found guilty after a jury trial on nine counts of burglary
 
 
 [2]
 Appellants Hubbard, Heldt, Snider, Willardson, Weigand, Hermann, and Raymond were charged with conspiracy to steal property of the United States (18 U.S.C. § 641), to intercept oral communications (18 U.S.C. § 2511(1)(a)), to forge United States government credentials (18 U.S.C. § 499) and to burglarize offices of the Internal Revenue Service, the Department of Justice, and the Office of the United States Attorney for the District of Columbia (22 D.C.Code § 1801(b)), all in violation of 18 U.S.C. § 371 (Count 1). They were also charged with conspiracy to obstruct justice (18 U.S.C. § 1503), to obstruct a criminal investigation (18 U.S.C. § 1510), to harbor and conceal a fugitive (18 U.S.C. § 1071), and to make false declarations (18 U.S.C. § 1623), all in violation of 18 U.S.C. § 371 (Count 23), and with one count of interception of oral communications (Count 2), ten counts of burglary (Counts 3-8, 14-15, 19-20), ten counts of theft of United States property (Counts 9-13, 16-18, 21-22), and one count of obstruction of justice (Count 24). Appellant Wolfe was charged with the obstruction conspiracy (Count 23), the obstruction of justice count (Count 24), five of the burglary counts (Counts 3-5, 7-8) and five of the theft counts (Counts 9-13). He was also charged with four counts of false declarations (Counts 25-28) and was named as an unindicted coconspirator in Count 1. Appellant Thomas was also charged in Count 1 (conspiracy), Counts 14-15 (burglary), and Counts 16-18 (theft). Michael Meisner was named by the grand jury as an unindicted co-conspirator in both conspiracy counts
 
 
 [3]
 A contemporaneous search of Scientology's offices in Washington, D.C. is not discussed because none of the documents seized in that search were offered in evidence in this case. See In re Search Warrant, No. 79-2138 (D.C.Cir.1981)
 
 
 [4]
 This Agreement, Joint Appendix (hereinafter "J.A.") at 356-58, is set forth as the Appendix to this opinion
 
 
 [5]
 All appellants except Thomas were sentenced pursuant to 18 U.S.C. § 4205. Appellant Hubbard was sentenced on Count 23 to a five-year term of imprisonment and fined $10,000. Appellants Heldt, Snider, Willardson, and Weigand were each sentenced on Count 23 to four year terms of imprisonment and each fined $10,000. Appellant Hermann was sentenced to a four year term of imprisonment on Count 1 and fined $10,000. Appellants Raymond and Wolfe were each sentenced on Count 23 to a five year term of imprisonment and each was fined $10,000. Appellant Thomas was sentenced on Count 17 to a fine of $1,000 and a one year term of imprisonment; six months of that sentence were suspended and she was placed on probation for five years
 
 
 [6]
 Under the Disposition Agreement the remaining charges remain outstanding pending disposition of the appeals
 
 
 [7]
 The "Red Box" program, as set forth in Government's Exhibit 219, stated:
 7984
 
 
 [25]
 Mar, 1977
 All concerned
 BI staff
 All Secs
 DGI US OFFICE
 VIA: DDGI US
 RE: RED BOX
 Dear All,
 This is to introduce into BIUS (Bureau of Information, United States) the complete red box system. Most of you have heard of this earlier-I will now explain it in detail. First of all, all data that is red box data, has to be pulled from your areas. The complete definition of Red Box material is attached.
 Secondly, you must ensure that none of your juniors, (for those of you who have them) have red box data in their areas.
 All the red box material from your areas must be centrally located, together and in a moveable container (ideally a briefcase), locked, and marked.
 When this is done in each area, we will divide up the amounts and deputize persons in the area to be responsible for its removal from the premises in the case of a raid. This procedure will be drilled. This procedure will stay in at the new location.
 Please have all this data sorted and located in proper container by Monday night Mar. 28. I will then divide up removal duties, and we will drill it Tuesday night just before the all hands.
 Love Judy
 (The exhibit also contains other handwritten comments.)
 RED BOX DATA INFORMATION SHEET
 
 
 [1]
 What is Red Box data?
 a) Proof that a Scnist (Scientologist) is involved in criminal activities.
 b) Anything illegal that implicates MSH, (Mary Sue Hubbard), LRH (L. Ron Hubbard).
 c) Large amounts of non FOI docs (covertly obtained government documents).
 d) Operations against any government group or persons.
 e) All operations that contain illegal activities.
 f) Evidence of incriminating activities.
 g) Names and details of confidential financial accts.
 
 
 [2]
 Where is Red Box data kept?
 a) Out of date material or finished cycles that can be shredded should be.
 b) Large amounts of red box data that is not needed for day to day function but cannot be destroyed is located with all our NON FOI docs-and can be called for via CIC.
 c) Small amounts of data that must be kept on hand due to security and frequent use-is to be kept in a briefcase locked up-and is to be marked. (In BI office area)
 
 
 [3]
 How is Red Box data, kept on the BI premises, cared for?
 a) This data will be picked up and carried out of the building by 'owner' immediately upon notification of a raid, search warrant etc.
 b) Persons carrying this data (as few as possible) will leave the premises and only return when they have called in and received an "all clear". (Details of who goes where with what data will be sorted out later-and drilled)
 This sheet contained the handwritten comment: "NOT FOR COPYING!! This sheet is to be returned to Sec of RBI US Dyn Mar 28, 1977."
 "NON-FOI docs (documents)" refers to government documents that were "obtained by covert action," J.A. at 186, i.e., not by suits under the Freedom of Information (FOI) Act.
 
 
 [8]
 L. Ron Hubbard, who was not indicted, and his wife, the defendant Mary Sue Hubbard, are respectively the highest and second highest officials in the Scientology organization
 
 
 [9]
 Wolfe was questioned briefly as to whether he had ever entered the IRS building after hours by using the "Thomas Blake" identification. He responded that he did not think he had done so. (J.A. 307-08)
 
 
 [10]
 See Tr. 8/27 at 188-90 (Agent Varley). The district court estimated that "over 150 FBI agents" were involved in the search. United States v. Hubbard, 493 F.Supp. 209, 234 (D.D.C. 1979)
 
 
 [11]
 See also Michigan v. Summers, --- U.S. ----, 101 S.Ct. 2587, 2592-93 & n.12, 69 L.Ed.2d 340 (" 'key principle of the Fourth Amendment is reasonableness-the balancing of competing interests' " quoting Dunaway v. New York, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979)); Roaden v. Kentucky, 413 U.S. 496, 501-02, 93 S.Ct. 2796, 2799-2800, 37 L.Ed.2d 757 (1973); Chimel v. California, 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969); Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968); Cooper v. California, 386 U.S. 58, 59, 87 S.Ct. 788, 789, 17 L.Ed.2d 730 (1967); United States v. Rabinowitz, 339 U.S. 56, 63, 66, 70 S.Ct. 430, 434, 435, 94 L.Ed. 653 (1950) ("whether the search was reasonable ... depends upon the facts and circumstances-the total atmosphere of the case")
 
 
 [12]
 Fifield Manor is located at 5930 West Franklin Ave., Hollywood, California
 
 
 [13]
 The Cedars-Sinai Complex is located at 4833 Fountain Avenue, Hollywood, California
 
 
 [14]
 The Washington search spawned its own line of litigation. On July 27, 1977, Chief Judge Bryant held that the warrant executed at Scientology's facility in the District of Columbia was invalid on its face, and granted Scientology's motion for return of the seized documents pursuant to Fed.R.Crim.P. 41(e). In re Search Warrant Dated July 4, 1977, 436 F.Supp. 689 (D.D.C.1977). This court reversed Judge Bryant's decision and upheld the validity of the District of Columbia warrant. In re Search Warrant Dated July 4, 1977, supra, 572 F.2d 321. Upon remand from this court, Judge Bryant then found that "the agents ... illegally and unconstitutionally executed this warrant and converted their seizure of documents into a general exploratory seizure in violation of the Fourth Amendment...." In re Search Warrant Dated July 4, 1977, No. 77-0151, Memorandum and Order at 10a (D.D.C. Aug. 27, 1979). The decision of the appeal to this court from that ruling is issued simultaneously with this opinion. In re Search Warrant Dated July 4, 1977, Nos. 79-2138, 79-2176 (D.C.Cir. October 2, 1981)
 
 
 [15]
 J.A. at 165. The affidavit was signed by FBI Special Agent Robert Tittle, and was based largely upon information obtained from Michael Meisner, a former "Assistant Guardian for Information" and "National Secretary" in the Scientology hierarchy. Id. at 168; p. 21 supra
 
 
 [16]
 See Fifield Inventory, Def. Exh. 421, 421a
 
 
 [17]
 See Tr. 8/23 at 50. Over 100 agents and other personnel are listed in the Joint Appendix as having been assigned to the Cedars-Sinai search, but it is unclear whether this count includes the 50 late-arriving agents. See Def. Exh. 575, List of Agents Assigned to Search, J.A. at 1314-15. Agent Varley stated that during the course of the Cedars-Sinai search approximately 180 FBI personnel were "on the scene," and that from one or two o'clock in the afternoon continuously until two a.m. the next morning between 110 and 130 FBI people were actually engaged in searching. Tr. 8/27 at 188-90
 
 
 [18]
 See Tr. 8/24 at 10; Tr. 8/27 at 17. United States v. Hubbard, supra, 493 F.Supp. at 230
 
 
 [19]
 See Govt. Br. at 51; App. Br. I at 11; Tr. 8/24, at 35, 36, 38
 
 
 [20]
 Compare Govt. Br. at 25 with App. Br. I at 30
 
 
 [21]
 See Church of Scientology v. United States, No. CV-77-2565-MML (C.D. Cal. Apr. 4, 1978, and July 5, 1978), reprinted at J.A. 201-229, 230-258 (California decisions); note 14 supra (District of Columbia decisions)
 
 
 [22]
 The government has returned voluntarily approximately 40% of the documents it seized. See United States v. Hubbard, supra, 493 F.Supp. at 234; Govt. Br. at 103 n.131a
 
 
 [23]
 Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)
 
 
 [24]
 The right to be free from unreasonably broad searches is distinct from those rights which concern a warrant's validity:
 "The general right of security from unreasonable search and seizure was given a sanction of its own and the amendment thus intentionally given a broader scope. That the prohibition against 'unreasonable searches' was intended, accordingly, to cover something other than the form of the warrant is a question no longer left to implication to be derived from the phraseology of the (Fourth) Amendment."
 Payton v. New York, 445 U.S. 573, 584 n.23, 100 S.Ct. 1371, 1379 n.23, 63 L.Ed.2d 639 (1980)(quoting N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 103 (1937)).
 
 
 [25]
 In this case, scope and intensity refer to the location and manner in which the search was conducted. See text at III 2, 3 infra. Regarding the term "intensity," see generally Harris v. United States, 331 U.S. 145, 152, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399 (1947) ("The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still.")
 
 
 [26]
 The following items appeared in the "Description of Property" attached to each of the warrants:
 
 
 [149]
 Synopsis of Gerald Wolfe's June 10, 1977 Grand Jury testimony
 
 
 [150]
 Memorandum, notes or report prepared by Richard Weigand on or about June 12, 1976 relating to Gerald Wolfe, Michael Meisner, about a surreptitious entry into the United States Courthouse building in the District of Columbia
 
 
 [151]
 Any notes, memoranda, or reports prepared by Michael Meisner and/or Gerald Wolfe relating to their entry into the United States Courthouse on or about June 11, 1976 and their confrontation with two FBI agents on that date
 
 
 [152]
 Guardian Order 1361
 
 
 [153]
 Guardian Order 1634
 
 
 [154]
 Any and all Guardian Orders issued pursuant to Guardian Order 1634 which would be identified as Guardian Order 1634-(number)
 
 
 [155]
 A Guardian Order generally identified as "Snow White"
 
 
 [156]
 Any and all Guardian Orders issued pursuant to the Guardian Order generally identified as "Snow White" which would be identified by the mention of "Snow White"
 
 
 [157]
 Any and all documents contained in the Operations Files concerning Robert Snyder
 
 
 [158]
 Any and all documents of the Internal Revenue Service relating to the Church of Scientology Calif. marked "Confidential, GO 1361 Material". (This would include the Hawaii and California cases.)
 
 
 [159]
 Any and all documents attached to a memorandum from Mitchell Hermann identified as "Mitch" or Michael Meisner identified as "Mike"
 
 
 [160]
 Any and all memoranda written by Michael Meisner identified as "Mike" making reference to attached government documents
 
 
 [161]
 Any and all documents marked "Non-FOI"
 
 
 [162]
 Any and all fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government property in violation of 18 U.S. Code §§ 371, 1503 and 641 which facts recited in the accompanying affidavit make out
 J.A. at 162-63.
 
 
 [27]
 We disagree with the statement in the concurring opinion that the "ideas" in these documents are protected by the decision in Stanford v. Texas, 379 U.S. 476, 478, 485, 85 S.Ct. 506, 508, 511, 13 L.Ed.2d 431 (1965). The documents here bear no relationship to the material seized in Stanford. Seizing the above documents in no way indicates an intent by the government to "(suppress) objectional publications," or to "(stifle) liberty of expression," when it is "books that are seized because of the ideas which they contain." Not one of the 14 items (149-62) includes any "book," or "publication" and none refers in any sense to any ideology, but only to ordinary unlawful conspiracies and substantive criminal offenses. The crimes charged here are not "ideological offenses." Those who formulate conspiracies to obstruct justice, steal government property, burglarize, bug, harbor fugitives from justice, and commit and suborn perjury before the grand jury (J.A. 108-149, 150-199) have no constitutional right under the first amendment to conceal the documentary evidence thereof. A mere reading of items 149 to 162 and the supporting affidavit makes it plain that none of them transgress the liberties protected by the first amendment. Likewise none of the documents are of a religious nature. In addition, this is not a third-party search situation as in Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), and freedom of religion is not endangered but encouraged when criminal conspiracies are suppressed that attempt to hide behind religion
 Defendants also allege that the warrants lacked probable cause for various particular items listed, and also that the warrants were based on stale information. The probable cause issue was briefly discussed in this court's earlier decision concerning the Washington warrant:
 These offenses (alleged in the affidavit) are not "amorphous"-they are specific, particularized and according to the affidavit supported by reams of hard documentary evidence as well as by sworn statements of some of the alleged conspirators and principals in the conspiracy and substantive offenses .... (W)e agree with the finding of the United States Magistrate that the affidavit did show probable cause(.)
 In re Search Warrant Dated July 4, 1977, supra, 572 F.2d at 326.
 Defendants now focus their attack upon the probable cause basis for Items 153-56. We fully agree with the district court that the affidavit provided adequate support for the inclusion of items 153-54 in the warrant. See United States v. Hubbard, supra, 493 F.Supp. at 218; J.A. at 171-72. Regarding items 155 and 156, we agree with the government that although the affidavit's description of "Snow White" as one of several "programs directed against governmental agencies" is "cryptic" and ambiguous, Govt. Br. at 74. Nevertheless, the affidavit does provide probable cause to believe that the "Snow White" program was linked to criminal activity. J.A. at 171-188.
 We also find that the affidavit provided adequate basis for the conclusion that any of the documents specified in the Description of Property might have been found either at Fifield Manor or at Cedars-Sinai; therefore it was appropriate for both warrants to list all 162 particulars. See generally United States v. Hendershot, 614 F.2d 648, 653-54 (9th Cir. 1980); United States v. Melvin, 596 F.2d 492, 495 (1st Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (affidavit need not prove that it is "more-likely-than-not" that evidence is at the particular location to be searched, but only that it would be reasonable to search for it in that location).
 Finally, we find unpersuasive defendants' argument that the affidavit was stale. A fair reading of the affidavit reveals that it was based on information confirmed within a month immediately preceding the search. See J.A. at 192-94. In this case, as in Andresen v. Maryland, supra, 427 U.S. at 478 n.9, 96 S.Ct. at 2747 n.9, it was "eminently reasonable" to believe that the documents sought in the warrant would be maintained in the locations indicated in the affidavit. See generally United States v. Hubbard, supra, 493 F.Supp. at 218.
 
 
 [28]
 Both sides vigorously argue the standing of the defendants to raise the propriety of the search as an issue in this case. The government concedes, however, that all of the defendants have a "legitimate expectation of privacy" in their respective personal offices. See Gov't Br. at 65-72; Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). It is essentially uncontested, therefore, that defendants may raise the issue of the scope of this search, at least insofar as it relates to their own offices which were located both at Fifield Manor (Heldt and Snider) and at Cedars-Sinai (Willardson and Raymond). The dispute over standing thus boils down to whether defendants' allegations of a general search can be based, even in part, upon evidence that agents rummaged at will in areas of Scientology's facilities not necessarily used by the defendants as their personal offices
 The district court's resolution of this issue is unclear. At one point the court stated that "only the defendants Heldt, Snider, Willardson, and Raymond have fourth amendment rights touched by the searches ... and their rights are limited to evidence seized from their offices which is being introduced against them." United States v. Hubbard, supra, 493 F.Supp. at 215. Yet the court also engaged in a lengthy analysis of defendants' allegations regarding a general search, allegations which rested upon the agents' conduct throughout their search of the Fifield Manor and Cedars-Sinai complexes. Id. at 228-34. We believe the district court properly addressed these general allegations, and in so doing properly considered the totality of the circumstances surrounding the search of the two buildings. See generally note 11 and accompanying text supra.
 
 
 [29]
 The district court noted that "defendants have made no attempt to directly challenge the legality of the seizure of these case-in-chief documents." United States v. Hubbard, supra, 493 F.Supp. at 221. Defendants did, however, submit to the district court an analysis of the government's case-in-chief documents, asserting that "all the case-in-chief documents must be suppressed." See Defendants' Resp. to Gov't Submission Relating to Case-in-Chief Documents, J.A. at 864, 869
 Although we have not been asked to do so, we have carefully considered defendants' analysis presented to the district court on this question, and find it meritless. First, defendants virtually concede the government's assertion that the documents were within the Description of Property listed in the warrant. See Defendants' Motion for Return of Gov't's Indexed Case-in-Chief Documents (Sept. 4, 1979). Second, their own chart detailing the location of the case-in-chief documents does not show any coming from Lawrence's office or from the "Action Bureau," the only locations the agents searched that appellants seriously argue were outside the warrant. J.A. 872-77. See pp. ---- - ---- & n.18, infra. Finally, defendants' allegation that those case-in-chief documents seized under Items 159-61 must be suppressed for lack of particularity is contrary to our holding that the warrant is sufficiently particularized. See p. 1257 supra.
 
 
 [30]
 But see Vonderahe v. Howland, 508 F.2d 364, 368-72 (9th Cir. 1974) (even where overbroad warrant is combined with overbroad search for documents, equitable application of exclusionary rule does not require suppression or return of all evidence seized)
 
 
 [31]
 Coolidge v. New Hampshire, supra, 403 U.S. at 467, 91 S.Ct. at 2038
 
 
 [32]
 The Court's directive to judicial officials in Andresen to enforce a minimization requirement, discussed immediately infra, has a parallel in eavesdropping and wiretap cases. See, e.g., Katz v. United States, 389 U.S. 347, 355-56, 88 S.Ct. 507, 513-14, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 53-4, 56-7, 66-67, 87 S.Ct. 1873, 1880-81, 1882, 1887, 18 L.Ed.2d 1040 (1967). See generally Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (concerning both judicial and statutory minimization requirements)
 
 
 [33]
 Thus if any of the documents used by the government as evidence-in-chief against defendants had been seized without scrupulous adherence to the warrant, we might be required to reverse. But defendants make no case for suppressing these particular documents on those grounds, see note 29 and accompanying text supra. There we have stated that the issue before us is not whether any particular documents used against defendants should have been suppressed because those documents were seized in violation of the scrupulous exactitude test; rather the question is whether documents lawfully seized under a valid warrant should be suppressed because the search accompanying their seizure was too general. The scrupulous exactitude test is too rigorous a standard to use in deciding that issue
 
 
 [34]
 2 W. LaFave, Search and Seizure § 4.10(d) (1978); see note 25 supra
 
 
 [35]
 Only when the agents are aware of the warrant, through personal knowledge or instruction, can they properly exercise the discretion vested in them to carry out its terms. Cf. Dalia v. United States, 441 U.S. 238, 257, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979) (in absence of specific instructions, execution of warrant "generally left to the discretion of the executing officers")
 
 
 [36]
 As Judge Leventhal pointed out, "we are concerned with realities of administration of criminal justice." Moore v. United States, 461 F.2d 1236, 1238 (D.C.Cir.1972). He went on to note that in judging whether a warrant is sufficiently particular, the court should assume that it will be "read 'with reasonable effort' by the officer executing the warrant." Id
 
 
 [37]
 The majority of the agents spent the day before the search being thoroughly briefed on the operation they were about to undertake. They were provided with copies of the affidavit and the search warrant, and questions regarding the warrant and the law of search and seizure were answered by their team leaders and by Assistant United States Attorneys. See United States v. Hubbard, supra, 493 F.Supp. at 229-30; Def. Exh. 361, J.A. at 1270; Def. Exh. 359, J.A. at 1256, 1258; Tr. 7/16, at 94, 144-45, 164-65, 171
 
 
 [38]
 At least one new agent admitted he had not read any of the 162 particulars in the warrant. Tr. 8/24, at 149. Supervising Agent Calley admitted that the briefing given to the late arriving agents lasted no longer than 15 or 20 minutes, and that they were not given copies of the warrant or affidavit to examine. Tr. 8/24, at 38-9. Surely what the FBI spent all day teaching and reviewing on the 7th of July could not be learned in only 15 minutes on the 8th. Agent Calley's simplified and imprecise explanation of the warrant's terms was an inadequate substitute for distributing copies of the warrant and affidavit to the agents for their reference. See Tr. 8/24, at 37-42 (Calley told the newcomers, inter alia, "to be alert for any documents that tended to indicate the Church was involved in the defamation of anyone's character ...," id. at 41); Tr. 8/27, at 188-90 (Agent Varley); Tr. 8/24 at 125, 129-30, 146, 154 (Agent Maryman); id. at 88A-89 (Agent Harmon); Tr. 8/27 at 61, 138 (Agent Dietzen); Tr. 7/16 at 287-88, 309 (Agent Oppy)
 
 
 [39]
 See generally Moore v. United States, 461 F.2d 1236, 1238 (D.C.Cir.1972); United States v. Johnson, 541 F.2d 1311, 1315-16 (8th Cir. 1976); United States v. Marti, 421 F.2d 1263, 1268-69 (2d Cir. 1970), cert. denied, 404 U.S. 947, 92 S.Ct. 287, 30 L.Ed.2d 264 (1971)
 
 
 [40]
 See Tr. 8/24, at 10
 
 
 [41]
 See note 17 and accompanying text, supra
 
 
 [42]
 See Tr. 8/24, at 43-44, 147; Tr. 8/27, at 317
 
 
 [43]
 See Tr. 7/16, at 272; Tr. 7/17, at 443; Tr. 8/24, at 177; 8/27, at 140
 
 
 [44]
 See Tr. 8/22, at 55; 8/24, at 41-44
 
 
 [45]
 See Tr. 7/16, at 309
 
 
 [46]
 See Tr. 8/22, at 55; Tr. 8/24, at 151-52; Tr. 8/27, at 318
 
 
 [47]
 See Tr. 8/24, at 177
 
 
 [48]
 See Tr. 7/16, at 310; Tr. 8/27, at 316-17
 
 
 [49]
 At Fifield Manor, defendants point out that the "Telex room" across from the Heldt suite was searched. However, they have stipulated to the fact that nothing was seized therein. J.A. 1337-38
 At Cedars-Sinai, the agents did conduct a broad preliminary search throughout the facility, but this was done only to ensure the safety of the agents, to prevent sabotage to the building or the documents, and to locate the file cabinets mentioned in the warrant. See Tr. 8/23, at 255; United States v. Hubbard, supra, 493 F.Supp. at 277. No documents were seized during this preliminary search. See J.A. 132; 152.
 However, later in the morning, a Cedars-Sinai search team entered an area of the first floor labeled the "Action Bureau," and seized a small number of documents concerning "codes." United States v. Hubbard, supra, 493 F.Supp. at 228; Tr. 7/16 at 243-50, 256-57. The "Action Bureau" was not mentioned in the warrant or affidavit as being subject to the search, see also Gov't Br. at 22 n.23, and Agent Oppy admitted that he continued to search this "Bureau" despite knowing that it was not the "Information Bureau" specified by the warrant. Tr. 7/16 at 248. Although this search of the "Action Bureau" violated the area limitations of the Cedars-Sinai warrant, see Church of Scientology v. United States, No. CV-77-2565-MML, (C.D.Cal. July 5, 1978), Mem. Dec. at 14-16, J.A. at 243-45, the few documents seized therein were returned by the government, United States v. Hubbard, supra, 493 F.Supp. at 228, and not submitted as part of its case-in-chief against defendants. See note 29 supra.
 
 
 [50]
 A path from the public hallway elevators to the Lawrence office structure (bottom left) which avoids the Heldt suite is illustrated by a broken line on the map here reproduced:
 
 
 [51]
 J.A. 1273, 1276. See also Govt. Stipulation, J.A. at 1278 ("On July 8, 1977, documents were seized by FBI agents from the office of Janet Lawrence")
 
 
 [52]
 See Tr. 7/6, at 291-92, 294
 
 
 [53]
 See note 50 supra
 
 
 [54]
 See Tr. 7/6 at 417-18; Tr. 8/29 at 324-30
 
 
 [15]
 The Court paced off the distance between the Heldt office and the hut. The distance is approximately nine feet
 
 
 [55]
 Statement by Mr. Boudin at oral argument. See also note 29 supra
 
 
 [56]
 See Tr. 7/19 at 5655-63
 
 
 [57]
 One agent, for example, who searched the Lawrence office apparently believed (erroneously) that it was part of the Heldt suite because access to it could only be obtained by entering Heldt's personal office. Tr. 7/20 at 6029-30. We note further that there were no washroom facilities in the Lawrence office, and that Mrs. Lawrence therefore had to make use of the facilities in the Heldt suite, a fact she admitted at the suppression hearing. See Tr. 8/29 at 326
 
 
 [58]
 See Part II C(2) supra
 
 
 [59]
 See Coolidge v. New Hampshire, supra, 403 U.S. at 469-70, 91 S.Ct. at 2040
 
 
 [60]
 See generally United States v. Rettig, supra, 589 F.2d at 423
 
 
 [61]
 See notes 37, 42-48 and accompanying text, supra
 
 
 [62]
 See App. Br. I at 37-41. The government's figure is around 50
 
 
 [63]
 Indeed our examination of a number of the defense exhibits makes clear that the requirement was not met in some cases. See, e.g., Def. Exhs. 277, 665, 51, 52, 53, 489, 498, 589A, 589B, 621, 620, 488, 500, 469 (all discussed at App. Br. I at 31-34)
 
 
 [64]
 It is for the district court, of course, to decide in the first instance whether these two safeguards-incriminating character and good faith/inadvertence-were observed during the search, and that court may employ any appropriate means to make the determination. For example, an examination here by the district court of those documents alleged not to have been listed in the warrant, or an examination of a representative sample thereof, might have been very helpful in judging whether the incriminating character requirement was obeyed. The judge might have ordered a study to be performed by an impartial master, or might have done one himself drawing upon a mutually agreed upon sample. In this case the trial court relied upon witness testimony to reach his conclusion, which we find supported by the record. See discussion at Parts II C(1) & (2) supra
 We also find that the district court acted reasonably in rejecting defense counsel's proffered studies purporting to analyze the seized documents. These studies were found to be unreliable due to various methodological flaws, see United States v. Hubbard, supra, 493 F.Supp. at 233; also, they might properly have been rejected because the subjective evaluations involved in them were performed by persons who might reasonably have been thought to be partial to one side.
 
 
 [65]
 In their motion for recusal, appellants described the "unusual security precautions" as follows:
 There was a table outside the courtroom with a sign that stated that all people had to be searched. There was a metal detector outside the courtroom. A security officer was observed with a loaded AR-15 automatic rifle in the courthouse on that day .... The courtroom used in this case was the only one that had a security table outside it or that had more than the usual number of marshals in it during that period. The Judge was accompanied at all times in or about the courtroom by two marshals ....
 Motion at 4, reprinted in J.A. at 1121.
 
 
 [66]
 28 U.S.C. § 455(a). Prior to its amendment in 1974, section 455 provided in full:
 Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appear, or other proceeding therein.
 
 
 [67]
 See United States v. Mirkin, 649 F.2d 78 (1st Cir. 1981); In re International Business Machines Corp., 618 F.2d 923, 929 (2d Cir. 1980); Rice v. McKenzie, 581 F.2d 1114 (4th Cir. 1978); Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir. 1980), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1981); Roberts v. Bailar, 625 F.2d 125, 129 (6th Cir. 1980); SCA Servs., Inc. v. Morgan, 557 F.2d 110 (7th Cir. 1977); United States v. Poludniak, No. 80-2133 (8th Cir. Aug. 14, 1981); Wood v. McEwen, 644 F.2d 797, 802 (9th Cir. 1981); United States v. Ritter, 540 F.2d 459 (10th Cir.), cert. denied, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976)
 
 
 [68]
 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3550 (1975); Comment, Disqualification of Federal Judges for Bias or Prejudice, 46 U.Chi.L.Rev. 236, 259 (1978)
 
 
 [69]
 Appellants do not argue that the trial judge erred by refusing to transfer the motion for recusal to another judge. In United States v. Haldeman, 559 F.2d 31 (D.C.Cir.1976) (en banc ), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), this court held that under section 144 and predecessor section 455 the transfer to another judge for decision is "at most permissive." Id. at 131. See also In re Corrugated Container Antitrust Litigation, 614 F.2d 958, 903 n.9 (5th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980)
 
 
 [70]
 Allegations regarding actual extrajudicial conduct or involvements, for example, may typically present a more compelling case for a hearing than a motion premised on rulings or comment made during actual courtroom proceedings which are urged as evidence of bias or prejudice stemming from an extrajudicial source
 
 
 [71]
 United States v. Haldeman, 559 F.2d 31, 132-34 & n.297 (D.C.Cir.1976) (en banc ), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977)
 For a long time before enactment of new § 455(a) in 1974, the judicial understanding of § 144 and old § 455 was that they were to be confined in operation to extrajudicial conduct or conditions.... Nothing we have observed in the legislative history of new § 455(a) suggests that this construction should be overturned. Absent clearer guidance as to the congressional intent, we agree.... The appearance-of-impropriety standard in terms summons a disqualification, not merely when the judge's impartiality might somehow be questioned, but only when it may reasonably be questioned. We think reasonableness of the challenge must take due account of the effect which its acceptance will have on the judicial process. So drastic would be the impact that we are unwilling to ascribe to ethical and legislative formulators of that standard a purpose to direct it toward judicial rulings on questions of law.
 559 F.2d at 133 n.297. See In re International Business Machines Corp., 618 F.2d 923, 929 (2d Cir. 1980); United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).
 
 
 [72]
 Appellants note correctly that particular judicial rulings can be evidence of an extrajudicial bias or prejudice. Appellants' Brief II at 32
 
 
 [73]
 Shortly before oral argument in this court, appellants moved to augment the record on appeal with what they described as "concrete evidence confirming the trial court's deception and bias." Appellants' Reply Brief II at 4 n.3. This motion was granted, but we have no occasion to consider the strength of these submissions, since we are accepting as true the facts stated in support of appellants' motion for recusal, which facts included a claim that the trial court deceptively concealed the reasons for the Los Angeles security
 
 
 [74]
 Security precautions, however, may also be taken to avoid disruption of court proceedings. See, e.g., Lacaze v. United States, 391 F.2d 516, 520-21 (5th Cir. 1968)
 
 
 [75]
 See, e.g., People v. Remiro, 89 Cal.App.3d 809, 153 Cal.Rptr. 89, 115 (photography, fingerprinting and search of spectators at trial of Symbionese Liberation Army member), cert. denied, 444 U.S. 876, 937, 100 S.Ct. 160, 288, 62 L.Ed.2d 104, 197 (1979)
 
 
 [76]
 Appellants' reliance upon Fed.R.Crim.P. 11(e)(1), which enjoins the trial judge from participating in discussions regarding plea agreements, is not persuasive. That rule seeks to avoid the appearance of prejudice that can arise where a judge might be thought to be pressuring a defendant into accepting a particular agreement. See Advisory Committee Notes to 1974 Amendment of Fed.R.Crim.P. 11. Cf. Longval v. Meachum, 651 F.2d 818 (1st Cir. 1981) (state court denied due process by urging plea bargain), petition for cert. filed, 50 U.S.L.W. 3131 (Sept. 8, 1981) (No. 81-261). The prejudice claimed here, however, is one that existed after the enforcement proceedings, if ever. In any event, "the mere fact that a judge has participated in plea discussions ... does not provide a reasonable basis for questioning a judge's impartiality." United States v. Cepeda Penes, 577 F.2d 754, 758 (1st Cir. 1978)
 
 
 [77]
 This contention would apply in many cases, and may have some application here, but we do not decide this phase of the case based on this argument
 
 
 [78]
 See Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir. 1980), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981)
 
 
 [79]
 Id. There is no showing here that the prosecutors did not act in good faith
 
 
 [80]
 The potential conflict of interest that might result from a personal civil suit filed against an Assistant United States Attorney (AUSA) by a defendant in a criminal case for acts undertaken by the AUSA in his official capacity in the criminal matter would have to be very strong before disqualification would be justified. It could not be justified by mere inference from the filing of the suit but would require proof, by clear and convincing evidence, of a prima facie case of misconduct on the part of the AUSA
 
 
 [81]
 Although it is apparent that appellants did not argue in their May 8, 1979, motion to disqualify that the prosecutors named in the civil suit had a conflict of interest, they contend on appeal that "(t)he district court was made fully aware that prosecutor Banoun, apart from being a witness to the search, was also a defendant in a pending civil suit arising from the search." Appellants' Brief II at 22. Appellants point to the transcript of the suppression hearing on July 16, 1979, when Assistant United States Attorney Banoun stated, "I am one of the defendants." Tr. 7/16/79 at 9. This statement was made during discussion concerning whether statements made by some of the agents who participated in the search to government lawyers in preparation for their defense in the civil action should be made available to the appellants
 Under some circumstances, the conflict of interest will be so strong that error might result if the trial court fails to disqualify a prosecutor from participation in a case when it learns of the facts giving rise to a conflicting interest. This, however, is not such a case. The alleged conflict of interest brought about by the prosecutors being named as defendants in the civil suit for acts taken in their official capacity is not at all apparent, as evidenced by the fact that appellants never relied on it as a basis for disqualification.
 
 
 [82]
 Cf. In re April 1977 Grand Jury Subpoenas, 584 F.2d 1366, 1369 (6th Cir. 1978) (en banc) (denial of disqualification motion not appealable because delay could "exert unwarranted influence in the government's choice of its prosecuting attorney"), cert. denied, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979)
 
 
 [83]
 This case, involving an alleged conflict of interest on the part of the prosecution, is to be distinguished from cases in which the burden of showing actual prejudice is typically not imposed. The cause for concern here is not on a par with that present in a case where the defendants' own attorney is laboring under a conflict of interest, see Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), or where he is tried before a judge with an interest in the result, see Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). In such cases, the rights at stake are so fundamental that even if no actual prejudice is shown, reversal is required. United States v. Decoster (Decoster III ), 624 F.2d 196, 201 (D.C.Cir.1979) (en banc ). While the prosecutor's duty "to seek justice," ABA Code of Professional Responsibility EC 7-13, cannot be minimized, the less fundamental nature of the threat to defendants, coupled with the government's responsibility to administer justice effectively on the public's behalf, makes actual prejudice the appropriate standard here
 
 
 [84]
 The use immunity statutes provide:
 § 6002. Immunity generally
 Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to-
 (1) a court or grand jury of the United States,
 (2) an agency of the United States, or
 (3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,
 and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.
 § 6003. Court and grand jury proceedings
 (a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.
 (b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment-
 (1) the testimony or other information from such individual may be necessary to the public interest; and
 (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.
 
 
 [85]
 We do not believe that the Second Circuit's decision in Turkish should be taken as holding that the government must grant immunity in every case unless the witness is "an actual or potential target of prosecution." Such an interpretation of the statute would ignore the fact that the witness is claiming self-incrimination. That the government is not then targeting the witness does not mean he might not eventually be a target. If all untargeted witnesses were granted compulsory use immunity then they could secure immunity from some of the worst then undiscovered crimes by merely testifying in court on a defendant's behalf
 
 
 [86]
 At the present time the claim is also belied by the facts in the stipulated record which support her conviction
 
 
 [87]
 Convictions were entered in accordance with the Disposition Agreement
 
 
 [88]
 See 18 U.S.C. § 6003, set forth in note 84 supra
 
 
 *
 Since no footnotes to this Agreement appear in Judge Richey's opinion or elsewhere in the record, the court assumes that the superscript "4" here is a typographical error
 
 
 [1]
 See per curiam opinion pp. 1262-1266 supra
 
 
 [2]
 See id. at 1261-1262
 
 
 [3]
 See id. at n.33
 
 
 [4]
 Id. at 1262
 
 
 [5]
 See id. at 1262
 
 
 [6]
 See id. at n.50
 
 
 [7]
 See id. at n.52
 
 
 [8]
 Id. at 1263-1265
 
 
 [9]
 See cases cited id. at 1259
 
 
 [10]
 Id. at 1261-1262 (emphasis supplied)
 
 
 [11]
 Id
 
 
 [12]
 See id. at n.33
 
 
 [13]
 See id. at 1260-1261
 
 
 [14]
 See id. at n.29